**UNITED STATES of America**

**v.**

**Jessie R. CARTER, Appellant.**

**No. 23728.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1970.

Decided April 30, 1971.

Fahy, Senior Circuit Judge, filed opinion concurring in part and dissenting in part.

Mr. Peter F. Healey, Jr., Washington, D. C., with whom Mr. John L. Kilcullen,

Washington, D. C. (both appointed by this Court) was on the brief, for appellant.

Mr. Robert J. Higgins, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Theodore Wieseman, Asst. U. S. Attys., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

■ This is the sorry story of a brutal, senseless and unprofitable crime, so characteristic of life and death in our urban centers such as Washington, D. C. Since the principal question in this appeal is the sufficiency of the evidence against appellant, and since he received a sentence of imprisonment from 20 years to life, we have examined the evidence with some care. Finding it sufficient, and appellant's other points of error not persuasive, we affirm.

The appellant and one Whiteside were charged with three offenses: robbery,[1] premeditated murder,[2] and felony murder.[3] On premeditated murder the District Court directed an acquittal; the jury convicted of robbery and felony murder.

On 29 December 1967 John Pointer, a part-time cab driver, made the mistake of picking up appellant and Whiteside at Fourteenth Street and Park Road, N. W., Washington, D. C. On the trip to the Southeast section of the city Whiteside rode in the back while appellant sat in front beside the cab driver. According to appellant's own story, in the Southeast section Whiteside called on the cab driver to stop, and when he did not do so immediately, Whiteside took

out a .22 caliber pistol and shot Pointer twice. One bullet entered the right side of the victim's neck just under the right ear, the other to the rear of the right ear.

At approximately 10:00 p. m. Whiteside and appellant were seen by a witness leaving the cab; Whiteside had blood all over one side of his trench coat. Around midnight other witnesses noticed the cab with the driver slumped over and called the police. The homicide squad examination found a pack of Pall Malls, later determined as belonging to appellant, on the right side of the dashboard. A large amount of blood was on both the front and back seats; the inside of the right front door and the outside of the left rear door were smeared with blood. The victim's right-hand jacket pocket was turned inside out. The driver's record of fares for the day totalled $24.60, but only a one-dollar bill was discovered—that being in his wallet. His change carrier was missing.

Shortly after ten o'clock appellant Carter and Whiteside entered a house about two blocks away from the scene of the crime. Six people were present at a small party, three of whom later testified. One of these was James Makel, the credibility of whose testimony assumed some importance in the trial. At the time they entered the house appellant's coat had a little blood on the sleeve, and Whiteside still wore the trench coat with the blood-spattered front. Whiteside washed his coat in the bathtub.[4] Both gentlemen felt the need to wash their hands. Appellant also washed blood from four one-dollar bills.

After an interval appellant Carter asked James Makel to drive them uptown. As the three left, appellant carried the two outer coats and put them in

---

1. 22 D.C.Code § 2901.

2. 22 D.C.Code § 2401.

3. *Id.*

4. These incidents were testified to not only by Makel but by two other witnesses present at the party. The remaining incidents and the ensuing conversation during the ride to town rest on Makel's testimony, but much of this witness' description—except that relating to events surrounding the robbery—is consistent with appellant Carter's own statement to the police.

the back seat of Makel's car. On the way toward town Makel stopped for gas. Whiteside paid for the gas with six quarters which he took from a silver change carrier. Appellant Carter had four one-dollar bills lying in his lap, but explained they could not be used because they were still wet from his having washed off the blood.

According to Makel's testimony, as they drove toward town appellant kept reiterating that Whiteside did not have to kill the cab driver; he said that he had the cab driver "up tight" and that Whiteside didn't have to shoot him. Appellant demonstrated what he meant by "up tight" by putting his arm around Makel's neck and shoulders to show that he (appellant) had grabbed the cab driver by the shoulder and neck and yoked him. He further explained, "That's how I got blood on my arm." Makel demonstrated this yoking at the trial in the same manner he testified appellant Carter had demonstrated to him. As they drove along, appellant kept repeating that Whiteside did not have to kill the man, saying "He killed him for some junk change."

When they arrived in the Northwest section near the house of Makel's brother-in-law, the appellant and Whiteside asked Makel if he would dispose of the two coats. When Makel declined, Whiteside put the coats into a trash can behind Makel's brother-in-law's house. Makel later put the coats on the back porch of the house, where they were found by the police on 2 January 1968, the day Whiteside was apprehended. In a search of Whiteside's apartment pursuant to his arrest, a .22 caliber derringer pistol, identified as the one Whiteside carried on the evening of 29 December 1967, was found in his closet, and the cab driver's silver change carrier in a trash can in his kitchen.

After appellant Carter was arrested two days later, he made a voluntary statement in which he admitted being in the cab with Whiteside when Whiteside killed the driver. He described going with Whiteside to the house where they encountered Makel and the drive uptown with Makel. He claimed that after the shooting Whiteside had given him four one-dollar bills with blood on them and recalled that Whiteside had a silver change carrier with him when they were in Makel's car. The appellant denied that he had participated in any plan to rob or kill the driver, and denied he had actually seen Whiteside commit robbery, although he confirmed Whiteside's act of murder.

On this appeal appellant's attack centers principally upon the credibility of the testimony of James Makel. One bizarre fact in evidence is that on the morning following the murder Makel went to his brother-in-law's home and told his brother-in-law that he was involved in the murder of a cab driver and had to leave Washington for awhile. Makel testified that his purpose in telling his brother-in-law this story was that in fact he was going to be evicted from his apartment and he had to have some place for his three children to stay. When asked why he didn't tell the story to the police, Makel stated that he was at that time on parole and feared that any "involvement" in the shooting would be a parole violation. There is no evidence whatsoever to connect Makel with the killing of the cab driver. Makel does not appear in the story prior to the arrival of appellant and Whiteside at the house, where Makel had been for some time with five other persons. Appellant's own story does not implicate Makel in any way; Makel's appearance on the scene was only to drive appellant and Whiteside uptown in response to appellant's request, after the crime had been committed.

It is difficult to discredit Makel's testimony; the jury obviously believed it.[5]

5. Whenever an appellant, as here, centers his attack on appeal on the testimony of a prosecution witness, it is well to remember the language of Judge (now Chief Justice) Burger in Bush v. United States,

Makel had known Whiteside about 17 years, but had never seen appellant Jessie Carter before he entered the house with Whiteside after the crime had been committed on 29 December 1967. Makel had no motive to fabricate any testimony implicating Carter,[6] and in fact Makel's recitation of Carter's conversation during the ride uptown does not appear as an effort to implicate appellant Carter in any way. Makel's testimony has Carter lamenting time and again that Whiteside did not have to kill the cab driver, and that Whiteside "killed him for some junk change." Makel's testimony to this effect would *exonerate* appellant Carter from any *intentional killing*, and in fact it had that effect, because the District Court directed a verdict for appellant on the count charging premeditated murder.

Appellant argues strenuously that from the verbal descriptions of the various witnesses it was impossible for Whiteside to have shot the cab driver as described by both Makel and appellant, and for appellant to have yoked the cab driver at the same time as described and demonstrated by Makel. But it was for the jury and the trial judge, who had the opportunity of seeing Makel's demonstration in the courtroom, to determine if there was any inconsistency, and apparently there was not.[7]

Appellant also inveighs heavily against the interpretation put by Makel on the words "up tight" used by appellant. But whatever appellant meant by saying he had the cab driver "up tight," those words could only mean that appellant was participating in some fashion in the robbery. If appellant had him "up tight," and he was participating in the attack on or in the robbery of the cab driver, appellant was participating in a felony. It may be true that the ultimate tragedy of the cab driver's senseless murder was far from appellant's mind, but under our statutory law, his participation in the robbery resulting in a killing made him guilty of murder in the first degree, of which he was duly convicted.[8]

126 U.S.App.D.C. 174, 176, 375 F.2d 602, 604 (1967) :

> The traditional safeguards of the Anglo-American legal system "leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." (Citing cases.) * * * Each witness appears before a jury on his own; jurors may believe or disbelieve, accept or discount, testimony on the basis of what the witness says and does or on the basis of impeachment evidence.

6. It can be argued that, since at the time of trial Makel was incarcerated in a Maryland state prison, he would be inclined to say what he thought "the Government" would want him to say, in the vague hope of some leniency. But Makel's imprisonment was in another jurisdiction; this fact was brought before the jury, and it was up to the jury to evaluate the effect, if any, on Makel's credibility.

7. In regard to the graphic demonstration of the yoking staged by Makel in the trial courtroom, and the appellant's contention here that such a yoking was completely impossible, given the description of the shooting and the location of the bullet wounds in the neck of the dead cab driver, we recall the language of this court recently in United States v. Skinner, 138 U.S.App.D.C. 121, 124, 425 F.2d 552, 555 (1970), in which we said:

> From such evidence the jury and court had a full opportunity to determine accurately the relative location of appellant with respect to the other participants at the critical moment when the shot was fired. * * * It has been said that a picture is worth a thousand words but for the purposes here required this demonstration was of even greater value because it vividly portrayed that essential third dimension which a picture lacks. * * * It is no objection to a demonstration presented as visual evidence that it is practically impossible to transmit to an appellate court for review as the same is true of much other evidence. Very frequently the character of the evidence received at trial affords the jury a much better means of judging it than an appellate court has of reviewing it.

8. This is so even though appellant was the accomplice of Whiteside, who did the actual shooting. 22 D.C.Code § 105. In

This testimony of Makel was completely sufficient to implicate appellant Carter in the robbery of the cab driver. We cannot ascribe to the witness Makel an intimate knowledge of the intricacies of the felony murder doctrine, i. e., we cannot impugn Makel's testimony by attributing to him a scheme to put appellant's neck in the noose for murder by implicating appellant in the robbery, and having sufficient legal knowledge to rest confident that the felony murder doctrine would do the rest.

Appellant's other points call for little comment. During the witness Makel's recitation of appellant's statements during the drive uptown, Makel testified, "Somewhere in there he said he hadn't been out on the street long, or something or other. He had just got out—" At this point he was interrupted by the prosecutor, but Makel continued, "Something like that. He said he just got out of Columbia." At the bench appellant's trial counsel moved for a mistrial, which the District Court denied. It was elicited from appellant's trial counsel that appellant had been recently jailed on a drunkenness charge. The trial court then instructed appellant's counsel that he could inform the jury of that or bring it out from the witness, which appellant's trial counsel declined to do. Appellant's counsel did not ask the court to inform the jury that appellant Carter's incarceration had been only on a drunk charge, nor did appellant's counsel request any kind of instruction, but stood on his motion for a mistrial.

Under these circumstances the trial court did not abuse its discretion in refusing to declare a mistrial. Experienced counsel frequently desire not to have a curative instruction which would focus the jury's attention on such a casual remark, and the witness' testimony, "He said he just got out of Columbia," does not refer to any penal institution in this jurisdiction. The witness' remark cannot be deemed to have prejudiced the appellant, certainly not in the degree warranting a mistrial then or reversal now.[9]

Nor did the trial judge err in acceding to the jury's request for all the photographs in evidence, the transcript of Makel's testimony, and appellant's own statement to the police. This was in fact all of the crucial evidence in the case and did not focus unfairly on any one aspect of it.

There was an eighteen-month delay between arrest and trial, but this was in substantial part accounted for by mental examinations requested by the appellant. Nor is there any showing of prejudice to the defense resulting from this eighteen-month interval. Appellant's own statement corroborated many of the facts of the murder, the only question raised concerned the testimony of the witness Makel, on the advice of counsel Whiteside remained silent, and appellant was the third man in the car. The testimony of no other witness could have assisted appellant at trial, hence there was no prejudice from any delay.[10]

Appellant's convictions for robbery and felony murder are therefore

Affirmed.

FAHY, Senior Circuit judge concurring in part, dissenting in part):

I concur in the affirmance of appellant's conviction of robbery. As to his

pertinent part, 22 D.C.Code § 2401, defining first degree murder, reads:
> Whoever, being of sound memory and discretion, * * * without purpose so to do, kills another in perpetrating or attempting to perpetrate any * * * robbery * * * is guilty of murder in the first degree.

9. *See* Hardy v. United States, 119 U.S. App.D.C. 364, 343 F.2d 233 (1964), cert.

denied, 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276 (1965); McIntosh v. United States, 114 U.S.App.D.C. 1, 309 F.2d 222 (1962), cert. denied, 373 U.S. 944, 83 S.Ct. 1557, 10 L.Ed.2d 700 (1963); Parker v. United States, 404 F.2d 1193 (9th Cir. 1968).

10. *See* Hinton v. United States, 137 U.S. App.D.C. 388, 424 F.2d 876 (1969).

conviction of felony-murder based on the killing by appellant's co-felon of the victim of the robbery, during the course of its commission, I would reverse. The instruction to the jury on that phase of the case, insofar as the instruction applied to appellant who did not himself kill the victim, did not require the jury to find, as I believe to be essential to his conviction of first degree felony-murder, that the killing was committed in furtherance of a design or purpose which appellant held in common with the one who actually killed the victim.

22 D.C. Code § 2401 provides that "[w]hoever * * * in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary * * * kills another * * * is guilty of murder in the first degree." [1] Under this provision only the person who actually kills another is guilty of first degree murder. To hold a co-felon such as appellant guilty of first degree murder more must be shown, namely, an aiding and abetting [2] in the commission of the crime of murder defined by Section 2401. That section does not provide that one who aids and abets the commission of a robbery during which another commits a homicide is sufficient for conviction of the former of first degree murder.

The instruction to the jury, nevertheless, was as follows:

> If two or more persons acting together and jointly are perpetrating a robbery or are attempting to perpetrate a robbery, and one or more of them, in the course of the robbery or attempted robbery, kills another person, then all the persons involved in the robbery or attempted robbery are guilty of murder in the first degree.

> If one person is perpetrating or attempting to perpetrate a robbery and one or more other persons aids and abets him in so doing, and the first of these persons in the course of the robbery or attempted robbery kills a human being, then the person or persons who aided and abetted him in the robbery or attempted robbery and the person who committed the killing are both equally guilty of murder in the first degree.

> Under the circumstances of this case, the elements of the offense of murder in the first degree which the Government must prove * * * are as follows:

> * * * * * *

> (4) That the killing was within the scope of the robbery or attempted robbery which Whiteside and [appellant] undertook to commit, if you find they so undertook to do so.

Appellant did not himself kill the deceased cab driver, and indeed he seemed to repudiate the shooting. Possibly the homicide was the independent act of appellant's co-felon, committed to the dismay of appellant. This is not to say that appellant could not be found guilty of murder. The problem is that his guilt of that offense was not submitted to the jury in terms which would allow, but not require, the jury to find that he aided and abetted commission of the homicide. The proper test in such a case in my opinion should be, not whether the homicide was within the scope of the robbery, but whether it was in furtherance of a common design or purpose.[3] *See* People v. Washington, 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130 (1965) (In Bank); Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472 (1958).

For the foregoing reason I would reverse appellant's conviction of first de-

1. Proof of deliberate and premeditated malice is not essential in such circumstances to a conviction of first degree murder.

2. 22 D.C.Code § 105.

3. This is not to say that the jury must find that appellant and Whiteside planned specifically to use the force of shooting the victim, but only that as a minimum they planned to use such force if necessary to consummate the robbery. This concert between co-felons, of course, could be shown by circumstantial evidence. The point, however, is that the determination should be left to the jury under instructions properly framing the issue.

gree murder and grant him a new trial of that charge with an instruction comformably with the views above expressed.

I concur in affirmance of the conviction of robbery.