**UNITED STATES of America**

v.

**Bernard J. HEINLEIN a/k/a Jimmy Holiday, Appellant.**

**UNITED STATES of America**

v.

**David A. WALKER, Jr., Appellant.**

**UNITED STATES of America**

v.

**Frank J. WALKER, Appellant.**

**Nos. 23226–23228.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 20, 1972.

Decided Oct. 11, 1973.

Rehearing Denied Nov. 7, 1973.

---

22. 356 F.Supp. at 1354.

23. See note 6, *supra.*

24. 348 F.Supp. at 1280.

William S. Block, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Theodore Wieseman, Asst. U. S. Attys., were on the brief, for appellee. Harold H. Titus, Jr., U. S. Atty., also entered an appearance for appellee.

Gilbert A. Cuneo and Charles E. Yonkers, Washington, D.C. (both appointed by this court) were on the brief for appellant in No. 23,227.

Stanley L. Temko, Richard B. Stewart, Russell H. Carpenter, Jr., and Ralph J. Temple, Washington, D.C., filed a brief on behalf of the American Civil Liberties Union Fund as amicus curiae, urging reversal.

Marilyn Cohen, Washington, D.C. and Frederick H. Weisberg, Brooklyn, N. Y. (both appointed by this court) also entered appearances for appellant in No. 23,228.

Before FAHY, Senior Circuit Judge, and McGOWAN and ROBINSON, Circuit Judges.

McGOWAN, Circuit Judge:

Appellants were charged with felony-murder (22 D.C. § 2401), murder in the second degree (22 D.C.Code § 2403), rape while armed (22 D.C.Code §§ 501, 3202), and rape (22 D.C.Code § 2801). They were convicted of felony-murder, and of the lesser included offense of assault with intent to commit rape while armed. When the jury was unable to agree as to punishment on the felony-murder count, the District Court sentenced appellant Heinlein to death, and both of the Walker brothers to prison sentences of twenty years to life. On the assault offense, each of the three appellants received a sentence of fifteen years to life. The death sentence for Heinlein has been invalidated by the supervening decision of the Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), with the effect that Heinlein stands before us

J. Alan Galbraith, Washington, D.C., with whom Edward Bennett Williams, Washington, D.C. (both appointed by this court) was on the brief, for appellant in No. 23,226.

Bruce J. Terris, Washington, D.C. (appointed by this court) for appellant in No. 23,228 also argued for appellant in No. 23,227.

in respect of his felony-murder conviction as one under a life sentence.[1]

All of the participants in the events giving rise to these appeals appear to have lived in the nether world of chronic alcoholism, and the events themselves are of a singularly squalid nature. Because of this, as well as the difficulties of reconstructing—through the imperfect instrument of a chronic alcoholic—what happened in this instance in that confused and cloudy environment, this was obviously a difficult and distasteful case to try, both for judge and jury.

We have, accordingly, examined the record in this case with special care. We have concluded that, with the exception of what we believe to have been a misconception by the court of the law of felony-murder in its application to accomplices, appellants had a fair trial, and that no unacceptable risk of a miscarriage of justice resides in affirming Heinlein's convictions on both counts, and the convictions of the Walker brothers for assault with intent to commit rape while armed. The convictions of the latter for felony-murder are reversed.

I

Appellants chose not to testify at trial. Accordingly, the only purportedly eyewitness version of the events in question was given by Mr. James Harding, a chronic alcoholic. On the morning of April 13, 1968, so Harding testified, he and Marie McQueen, the murder victim, were released after overnight incarceration for drunkenness. After buying some wine, they met Bernard Heinlein and the Walker brothers, David and Frank, on the street. The five of them then went to an apartment occupied by the Walkers to drink the wine. Heinlein told McQueen that he wanted to have

sexual relations with her, and the Walkers both voiced support of this proposal. When McQueen refused, the three appellants seized her, held her down, and began to remove her clothing. During the struggle, McQueen slapped Heinlein in the face. His response was to take a knife from his pocket and stab her, inflicting what proved to be a fatal wound. McQueen was then carried down into the basement by her assailants, and Harding last saw her lying on the floor there, apparently just barely alive.

Harding testified that he was a friend of the deceased, but that paralysis of the left side of his body prevented him from helping her during the brutal assault. Harding was arrested for drunkenness again a few hours later but made no report of the incident. Appellants were also arrested for drunkenness later that day. The body of the deceased was discovered two days later by a neighbor. One day after that, Harding made a statement to the police which implicated appellants.

Other witnesses for the Government were Detective Cannon of the Metropolitan Police Department; Special Agent Kelleher of the FBI, an expert in serology; and the Coroner, Dr. Whelton. Detective Cannon testified as to his findings when he arrived at the scene at 2:00 P.M. on April 15. The deceased was lying in a large pool of dried blood on the basement floor immediately inside the door leading from the basement to the first floor. After discovering what was apparently blood on the first six steps leading down from the first floor to the basement, and noticing blood on the banister and on the door of the first floor apartment of the Walkers, Detective Cannon obtained a search warrant for the apartment. Some three

1. When these appeals first were ready to be heard, we separated that of Heinlein from the other two for hearing en banc in accordance with our past tradition of handling capital cases. The en banc hearing of Heinlein was deferred pending decision by the Supreme Court of the death cases then pending before it. A panel of this court heard argument in the Walker appeals, and then recommended that they be put en banc with Heinlein. This was done, but, after the Supreme Court acted, the en banc order was vacated, and the three appeals were set down together for oral argument.

feet into the room he found blood on the linoleum, which appeared to present a drag pattern as if someone in the apartment had been dragged to the door. He also found several items of physical evidence, including a blue scarf, a bra which would fit the deceased, a green bedspread and two green sheets, a woman's slipper, and a certain amount of trash.

Special Agent Kelleher testified that he found type O human blood (the blood type of the deceased) on five of the ten items included in the trash, and also upon one of the green sheets. There was human blood on the blue scarf, but the type could not be determined.[2] Dr. Whelton testified that tests had established that the decedent had had sexual relations not long before her expiration.

The defense put forward at trial was an effort to demolish Harding's credibility. This was based upon asserted inconsistencies between his testimony at trial and prior statements made by him to the police, at the preliminary hearing, and to the grand jury. A witness was produced in the person of Dr. Prochazka, a psychiatric resident at St. Elizabeths, who testified that she examined Harding in October of 1967 and made a diagnosis then of chronic brain syndrome associated with alcoholic intoxica-

tion, with moderate to severe memory defect. The District Court also permitted Harding's credibility to be impeached by prior convictions consisting of 42 prior drunk convictions, a 1950 conviction of assault with intent to commit rape, two 1953 convictions for forgery and uttering, and a 1968 larceny conviction.[3]

## II

■ A principal claim of error advanced on behalf of all the appellants is that Harding was not a competent witness. In particular, it is urged that the District Court erred in failing to grant appellants' motion that Harding be subjected to a psychiatric examination with respect to his competency.

■ The trial began on April 28, 1969.[4] On the second day Harding completed his direct examination, and was cross-examined at great length by counsel for Heinlein. At the beginning of the third day of trial, appellants' motion was made. In support of it, it was argued that Harding had displayed confusion in his testimony on the previous day. Counsel also reported that, at the end of the preceding day, St. Elizabeths' records had been subpoenaed which indicated a medical basis for Harding's al-

---

2. Heinlein and Harding had type A blood, whereas each of the Walkers had type O blood. Kelleher's examination of the clothes that appellants were wearing when arrested showed some type A blood on those of Heinlein, with human blood of an undetermined character on his underclothing. This latter was also true of David Walker.

3. This was in contrast with the court's action in the case of appellants. At a hearing outside the presence of the jury on the first day of trial, the court had been asked to bar the Government from impeaching the appellants with their prior convictions, but had declined to do so. After the conclusion of the Government's case, the court announced to appellants that it had changed its mind, and assured them that no impeachment on this basis would be permitted if they elected to take the witness stand. As noted above, they did not avail themselves of this opportunity.

4. Because this was a little over a year from the time of appellants' arrest, they press a

claim that their right under the Sixth Amendment to a speedy trial has been denied. Our examination of the chronology of events in this case indicates that a significant part of the delay is not to be attributed to the Government, since much of the time was required by "the deliberate pace of the system of safeguards designed to protect the accused." Blunt v. United States, 404 F.2d 1283, 1287, 131 U.S.App.D.C. 306 (1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1021, 21 L.Ed.2d 221 (1969). It is said that prejudice resulted in terms of the effect of the delay on the memory of the witness Harding, but it seems fair to say that the prosecution suffered as much, if not more, than the defense on this score. Taking all of the relevant factors into account, this is far from being a case where the drastic sanction of dismissal of the charges must be imposed. See Strunk v. United States, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

legedly inadequate performance on the stand. It was also said that an expert examination would take into account the fact that Harding had been drinking at the time of the events described by him. The court's ruling was couched in these terms:

"THE COURT: As far as this witness is concerned, he has shown confusion and he has shown different statements at different times, primarily about matters that really don't go to the crux of this case, and that is as to where he went and what order immediately after this thing went on.

He may have been inexpertly questioned. We have seen from the stand that he has to be questioned very carefully; otherwise he gets the wrong impression of the question and gives an answer that might be considered at variance with another answer he has given.

But his testimony is primarily important, as I see it, to put these people at the scene of this crime, and in this he has never varied, never varied.

The jury is perfectly competent to weigh the testimony of this witness.

As a matter of fact, that is one of the two chief functions of a jury. One is to weigh the testimony of witnesses, the other of course is to decide the facts.

And the jury is perfectly competent to do this.

I have observed nothing in this man to indicate other than that he is an alcoholic, that his memory is clouded as to certain events, it doesn't appear to have been clouded as to others as far as putting these people at the scene of the crime. That he has never been shaken in by any statement that I know of.

I don't believe that the interest of justice demands such a psychiatric examination, which I don't believe would be the slightest help.

I think the jury in this matter is altogether competent to judge the effect of this man's testimony, and I will deny your motion."

■■ It is apparent from the foregoing that the trial court did not regard Harding as a particularly impressive witness, as indeed he was not—a fact upon which appellants presumably relied when they decided not to take the witness stand, and which was argued vigorously by their counsel to the jury as a reason for rejecting his story *in toto*.[5] In this jurisdiction as elsewhere, however, the "competency of the witness to testify before the jury is a threshold question of law committed to the trial court's discretion;" and the decision as to whether a court should order a psychiatric examination in order to aid it in resolving the issue of competency "must be entrusted to the sound discretion of the trial judge in light of the particular facts (footnote omitted)." *United States v. Benn & Hunt,* 155 U.S.App.D. C. 180, 476 F.2d 1127 (1973).

In *United States v. Butler,* 156 U.S. App.D.C. 356, 481 F.2d 531 (1973), this court has quite recently said:

The question of when a trial judge should order a physical and psychiatric examination of a prosecution witness was directly considered by this court in *United States v. Benn & Hunt. . . .* We there explained that such an examination "may seriously impinge on a witness' right to privacy; . . . the examination itself could serve as a tool of harassment;" and the likelihood of an examination could deter witnesses from

---

5. As an independent ground of reversal, appellants variously assert that the evidence was insufficient to support the verdicts of the jury against them. Our reading of the record convinces us that this claim is without merit. If Harding is assumed to be competent to testify at all, his testimony involves all three appellants in the assault upon McQueen. In the case of the Walker brothers, even if each specific act attributed to a particular brother is disregarded because of Harding's difficulties in keeping their identities separate, there are several references to simultaneous participation by all three appellants. That testimony by Harding, which the jury evidently chose to believe, stands completely unrebutted.

coming forward. . . . The resultant presumption against ordering an examination must be overcome by a showing of need.

In both *Benn* and *Butler*, this court, speaking through Chief Judge Bazelon, sustained the action of the District Court in failing to order a psychiatric examination of a key Government witness.

■ Appellants' motion was made at the beginning of the third day of trial. Such a motion should, of course, normally be made in advance in order that there may be no disruption of a jury trial once it has gotten under way. Appellants offer certain justifications for their failure to move sooner, but we do not pursue the question for there is nothing in the record to suggest that the court's denial was based on this circumstance. To the contrary, the court's statement of its reasons starts from the premise that it was the fact of delay which resulted in the court's having heard and observed the witness testify for virtually an entire trial day, in the course of which he gave his direct testimony in full and was subjected to extensive and vigorous cross-examination. It was thus by reference to Harding's actual performance on the witness stand, and not due to any dilatoriness on the part of defense counsel (even if that be assumed to exist), that the judge made his ruling.

The scope of our review of that ruling is limited—and necessarily so—by the fact that it was the trial court, in contrast to ourselves, which had the opportunity to observe Harding at first hand. *See* State v. Franklin, 103 R.I. 715, 241 A.2d 219, 225 (1968). Unless the record provides unmistakable evidence that the trial court's impressions are defective, we have no warrant for giving ascendancy to our more remote vantage point.

The arguments urged upon the trial court in support of the motion stressed

(1) what was said to be the highly confusing character of Harding's testimony as given, and (2) the suggestion in the St. Elizabeths' records that Harding had a clinical history which rendered him wholly unreliable. As to the former, the trial court, as we have seen, readily recognized that there had been elements of confusion in Harding's story. A prominent one of these had been his apparent inability to differentiate between the Walker brothers by name, which resulted in the court's fashioning the expedient of having Harding refer to one brother as "the tall one" and the other as the "heavy-set one;" and it is by no means certain from the transcript that even this device was uniformly successful. *See* note 5 *supra*.

Cross-examination on the first day of trial had also exposed discrepancies and gaps in Harding's statements to the police, his appearance at the preliminary hearing, and his testimony before the grand jury. But the court, noting that Harding's various statements, despite some differences, related essentially to the same event and described all three appellants as active participants, concluded that these differences were not such as to shake significantly Harding's all-important account of what happened to Marie McQueen. Although subjected to severe defense challenge, as the only prosecution witness purporting to have direct knowledge of what went on in the Walkers' apartment, Harding's story in that regard held together in a way not indicative of incompetency.

The second aspect of the defense argument was that Harding was essentially lacking in capacity to recall past events accurately, and that any effort on his part at historical reconstruction could only be pure confabulation. At the time the motion was argued, the defense had two things to go on in this regard. One was the St. Elizabeths' records.[6] The other was the fact that

---

6. Counsel pressed upon the trial court certain entries made in 1961 and 1967. In the former year a clinical report characterized Harding in these terms:

"The patient drank excessively, had domestic problems and had a feeling that when he walked down the streets people were looking at him and wanted to harm him."

Harding's account of his movements during the several hours immediately succeeding the alleged slaying was plainly untrue, as the official records showed that he had again been arrested and detained for intoxication during the afternoon of the day in question. It was argued that, if this latter account was a fabrication, then so must be the tale of the Walkers' apartment.

The difference, however, is that Harding's friend, McQueen, was subsequently found dead under circumstances corroborative of Harding's version of the events culminating in her death. This hard fact stands against any claim that, because Harding may, although with no apparent incentive to do so, have lied

about where he was and what he did later in the fatal day, he also lied about the events of the morning. In any event, it leaves us unable to say that the trial court abused its discretion in refusing to treat Harding as a witness of actual or potential incompetency.

## III

Appellants Frank and David Walker seek reversal of their felony-murder convictions on the ground that the jury was improperly instructed. Their counsel unsuccessfully requested use of the felony-murder instruction on accomplices contained in the Junior Bar Association Criminal Jury Instructions.[7] The words

In 1967 one clinical report said of Harding that he "was only fairly well oriented." Two others referred to memory difficulties; and the eventual diagnosis was couched in these terms:

"Acute brain syndrome associated with alcohol intoxication and chronic brain syndrome associated with alcohol intoxication without qualifying phase."

One of the examining physicians in 1967, Dr. Martha Prochazka, testified later in the trial for the defense. Her testimony was generally to the effect that Harding's mental problems were caused by excessive use of alcohol. She suggested that Harding might be suffering from something known as Korsakoff's Psychosis—a condition in which a person conceals his inability to remember by fabrication. She could not make a positive diagnosis of such a condition without further neurological examination. The motion for psychiatric examination was not, however, renewed during or at the close of the defense testimony.

7. This Junior Bar Instruction (No. 84) in full is as follows:

The essential elements of the offense of murder in the first degree [felony-murder], each of which the Government must prove beyond a reasonable doubt, are:

(1) That the defendant inflicted an injury or injuries on the deceased from which the deceased died; and

(2) That the defendant did so while perpetrating or attempting to perpetrate the offense of [arson; rape; mayhem; robbery; kidnapping; or housebreaking while armed with or using a dangerous weapon].

It is not necessary that such a killing have been committed with the purpose and intent to do so by the defendant. Any

killing, even if committed without purpose and intent to kill and even if accidental, is murder in the first degree if committed in the perpetration or attempt to perpetrate [one of the enumerated felonies].

[Instruction When There Are Multiple Defendants—If two or more persons, acting together, are perpetrating or attempting to perpetrate [one of the enumerated felonies] and one of them, *in the course of the felony and in furtherance of the common purpose to commit the felony*, kills a human being, both the person who committed the killing and the person who aided and abetted him in the felony are guilty of murder in the first degree.] [Emphasis supplied].

The instruction given by the court was in this form:

Now, if a person kills another in the perpetration of a rape or in attempting to perpetrate a rape, the killing constitutes murder in the first degree.

Under such circumstances, it does not make any difference whether or not the killing was committed with or without any purpose so to do. Any killing, even if it is committed without any purpose so to do, even if it is accidental, if it is committed in perpetrating or attempting to perpetrate a rape, is murder in the first degree.

If two or more persons acting together and jointly are perpetrating a rape or attempting to perpetrate a rape, and one or more of them *in the course of the rape or attempted rape*, kills another person, then all of the persons involved in the rape or attempted rape are guilty of murder in the first degree.

If one person is perpetrating or attempting to perpetrate a rape and one or more

in that instruction which appellants regard as of critical importance are contained in the phrase "in the course of the felony and in furtherance of the common purpose to commit the felony." These words are, in their submission, to be compared with the qualifying phrases in the instruction as given, namely, "in the course of," and "as a part of" the rape or attempted rape, and "within the scope of the rape which one or more or the defendants undertook to commit."

It may be true, as appellants assert, that the words "in furtherance of the common purpose" in the requested instruction would have focused the jury's attention more directly on the causational element of felony-murder than did the instruction given by the District Court. Those words emphasized that the slaying must be causally related to the objects of the felony, whereas under the latter mere coincidence of time and place between the felony and the murder might be thought to suffice. To that extent, the Junior Bar instruction conforms more nearly to the requirements of our statute as it has been interpreted in respect of accomplices,[8] and is therefore preferable to the instruction given.

It may also be true, however, that the verbal differences between these two formulations, in terms of practical impact upon the jury, are not very great. A slaying which may be said to have occurred "within the scope of" a particular felony might also be regarded as "in furtherance of the common purpose to commit the felony." Under either instruction defense counsel could presumably argue to the jury that the slaying was so unrelated to the object of the felony as to be beyond its scope, in the one case, or not in furtherance of the common purpose to commit it, in the other. On our facts, the argument would be that Heinlein's stabbing of McQueen was an unexpected response to his being slapped in the face and was independent of any common purpose to rape. Indeed, any sudden killing of McQueen by one of the appellants could be regarded as frus-

---

other persons aids and abets him in so doing, and the first of these persons *in the course of the rape or attempted rape, as a part of the rape or attempted rape,* kills a human being, then the person or persons who aided him in the rape or attempted rape and the person who committed the killing are all guilty of murder in the first degree.

Under the circumstances of this case the elements of the offense of murder in the first degree which the Government must establish beyond a reasonable doubt as to the first count are as follows:

One, that the defendants were in the District of Columbia jointly perpetrating or attempting to perpetrate a rape or that one of the defendants was perpetrating or attempting to perpetrate a rape and the other defendants aided and abetted him in so doing.

Two, that in the course of ·so doing one of the defendants killed the deceased, Marie McQueen.

Three, that the victim, Marie McQueen, died as a result of a wound or wounds inflicted by one or more of the defendants.

Four, *that the killing was within the scope of the rape or attempted rape which one or more of the defendants undertook to commit.* (Emphasis supplied).

8. In Patten v. United States, 42 App.D.C. 239, 247, 250 (1914), this court said that

   " . . . when two or more persons combine to commit a criminal offense, each is responsible for the acts of the other *in furtherance of the common purpose,* if the act done either is within the scope of the purpose, or is the natural or probable consequence of the act intended.
   . . .

   \*      \*      \*      \*      \*

   But an act done by one of several conspirators who have unlawfully assembled, and are actually perpetrating a crime, *if entirely outside of the common purpose,* and not inspired by the other conspirators or participated in by them, will not render them liable therefor." (Emphasis supplied).

   In Collazo v. United States, 90 U.S.App.D.C. 241, 248–249, 196 F.2d 573, 580–581, cert. denied, 343 U.S. 968, 72 S.Ct. 1065, 96 L.Ed. 1364 (1952), we used this same language in respect of the aiding and abetting statute, holding that the shooting of a presidential guard by the defendant's accomplice could be attributed to the defendant if it was in furtherance of their common design or plan.

trating and defeating that common purpose, and therefore alien to it.

If such argument had been permitted in this case, the differences between the two instructions might not be such as to compel reversal. The District Court, however, appears to have construed the statutory definition of felony-murder to preclude such a defense, and to have restricted argument to the jury accordingly. The following rather lengthy colloquy begins as the trial judge is discussing the Walkers' request for the Junior Bar instruction, and, in particular, is reading part of his proposed instruction on felony-murder to counsel:

> The fourth element. That the killing was within the scope of the rape or attempted rape which one or more defendants undertook to commit.

> Now, it does seem to me that if the killing was committed as has been described by Harding, that it was within the scope of the rape or attempted rape. And unless you have a District or a federal case that is the way I will instruct it.

> MR. HEYMANN: Your Honor, I have been throughout District cases, District of Columbia cases and I have not found anything that is on point.

> Once again the classic case is Red Line [sic], (Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472 (1958)), it says conduct must have been in fur-

therance of the design to commit the felony, death must have been the consequence of the felony and not merely coincidence.

> If you turn it down, I would like it clearly noted that we requested the standard instruction and the specific language in furtherance of the common purpose to commit the felony and that was declined, Your Honor.

> THE COURT: All right. I do decline 84 and I think mine better states what the law is or ought to be.

> Now, is there any other—

> MR. HEYMANN: May I ask you one question, Your Honor, on your instruction?

> THE COURT: Yes.

> MR. HEYMANN: In terms of closing argument and your language of scope of the felony, would it be appropriate or wrong for us to argue that even if you took Harding's testimony as true, and if you then believe that Heinlein struck back in a sudden irrational rage and not in order to further a rape, then you would have to find Frank Walker and David—

> THE COURT: No, I would not permit you to argue that. If I am right in the law, that would still be within the scope of the rape, so I would not permit you to argue that.[9]

---

9. In the argument to the jury that defense counsel actually made, there is only one passage where a question was raised as to whether he was observing the court's prior ruling on the permissible scope of his argument. Because this further illustrates the restriction, we quote the following from the transcript, which begins with defense counsel's jury argument as it approached its conclusion:

> I am near the end. But this doesn't end the difficulties in the Government's case as to Frank Walker. Crimes are made up of intentions as well as actions.

> What is left after we have gone through that list to show an intention to rape. The one act that was only forgotten about on one prior occasion and mentioned on the two prior occasions is the grabbing of the collar of the coat.

> To say that manifested an intention of rape beyond a reasonable doubt is, as I said before, to accuse the drunk on the street who grabs my arm and asks me for a coin of attempted robbery, or to accuse the man at a party, the drunk who grabs a lady by the arm or dress, of attempted rape.

> The intention is simply not shown. And what of second degree murder? In there, too an intention to act with some wanton disregard of human life, such that you would expect death to result from your actions, or at least you could foresee it with some clarity.

> If you believed Harding's testimony, and our first point, again, our first ground is that Harding's testimony is not entitled to any credence at all, if you believe it you would have a picture of three men trying

The foregoing indicates that the trial judge foreclosed counsel from arguing to the jury matters not going to intent as such, but which do relate to a concept which may, without significant alteration of meaning, be variously phrased as either (1) the scope of the felony which the participants undertook to commit, or (2) the furtherance of the common purpose which the participants entertained in embarking upon it.

We deal with the crime of felony-murder as it is defined in our statute.[10] Our central task is, thus, one of statutory interpretation. It would perhaps be possible to read the relevant statute as contemplating only a coincidence in point of time and place between the commission of the felony and the occurrence of the slaying. This is what the trial judge did, but this does not, however, seem to be what the formulators of jury instructions in this jurisdiction have done. Both the Junior Bar instruction refused by the trial judge, and the one given by him, include phrases which seem to look beyond this concept of mere coincidence.

If these inclusions reflect a proper interpretation of the statute, then the trial judge erred in ruling that, on the evidence adduced, the slaying was clearly within the scope of the felony of rape which the defendants undertook to commit. By so doing, he prevented defense

counsel from suggesting to the jurors that the evidence warranted a finding by them that, insofar as the Walker brothers were concerned, the scope of the common undertaking had been exceeded. They would, of course, not have been obliged to make that finding, but it would appear to have been open to them even under the terms of the court's instruction as given.

■ The D.C. felony-murder statute is addressed in terms only to the person who kills while perpetrating a felony. Accomplices, like the Walker brothers, are exposed to first degree murder accountability by reason of the aiding and abetting statute. It is true that that exposure does not depend upon proof of an intent to kill on the part of the accomplice; that intent is supplied by the fact of participation in the felony giving rise to the killing. But, certainly as to accomplices, the matter does not end there. The common law concepts of causation and vicarious responsibility are operative. The accomplice who aids and abets the commission of a felony is legally responsible as a principal for all acts of the other person which are in furtherance of the common design or plan to commit the felony, or are the natural and probable consequence of acts done in the perpetration of the felony.

to have intercourse with Marie McQueen, she suddenly getting her hand loose and slapping one of them, Heinlein, across the face, and he responding in an instant anger and slashing her with a knife.

Now could anyone have foreseen that? Could Frank Walker have had the intent that that happen? He couldn't unless he knew it was going to happen. Could he have wanted to assist? Not unless he knew it was going to happen.

Could he have seen it as a risk so certain that he displayed wanton disregard of human life? Even if he had no other problems, ladies and gentlemen of the jury, you couldn't find the intention. And you don't have any of the actions on the basis—

THE COURT: Counsel, you are not now arguing within the instructions that the Court will give the jury in felony murder.

MR. HEYMANN: I would like to make that clear, Your Honor. I am not talking about the felony murder count. I am talking about, only about the second degree murder count.

THE COURT: All right.

MR. HEYMANN: I apologize if there was anything misleading about that, Your Honor. I meant to keep it in second degree.

10. In pertinent part 22 D.C.Code § 2401 provides:

Whoever . . . in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary . . . kills another . . . is guilty of murder in the first degree.

Although this provision applies only to the person who actually does the killing, its scope is extended to accomplices by the aiding and abetting statute, 22 D.C.Code § 105.

It was upon these terms that the common law encompassed the imposition of liability for first degree murder upon one who neither killed nor had any intent to kill, but only took part knowingly in the commission of a felony. We made clear as long ago as Hamilton v. United States, 26 App.D.C. 382 (1905), that the definition of felony-murder contained in our statute was taken from the common law of Maryland, which was in effect in the District of Columbia by Congressional declaration from 1801 until our statute was first enacted in 1901. The amendment to the statute made in 1940 was intended not to change but only to clarify the persistence of the common law concept of felony-murder.

Under the common law concept it seems clear that there was room for jury issues relating to whether the slaying occurred within the scope of the felony which the parties undertook to commit, or in furtherance of their common plan or purpose to commit it. The Supreme Court of Oregon recently pointed to what appears to have been the common law concept. Quoting with approval Wharton's Criminal Law & Procedure, Vol. I, at 544, the court stated the rule in these terms:

> Something more than a mere coincidence of time and place between the wrongful act and the death is necessary. It must appear that there was such actual legal relation between the killing and the crime committed or attempted that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it. State v. Schwensen, 237 Or. 506, 392 P.2d 328, 334 (1964).

■ It does not appear to be true, as some have supposed, that the current felony-murder statutes embody a legislative purpose to deter the commission of felonies to the point of embracing the coincidence rationale. As the New York Court of Appeals commented in People v. Wood, 8 N.Y.2d 48, 51–52, 167 N.E.2d 736, 738–739 (1960):

> [A] felony murder embraces not any killing incidentally coincident with the felony . . . but only those committed by one of the criminals in the attempted execution of the unlawful end. Although the homicide itself need not be within the common design . . . the *act* which results in death must be in furtherance of the unlawful purpose. . . .

> In other words, in order for a felon to be guilty of the homicide, the act (as in agency) must be "either actually or constructively his, and it cannot be his act in either sense unless committed by his own hand or by someone acting in concert with him or in furtherance of a common object or purpose." . . . Where, however, the felon kills someone during the felony, but in a separate and distinct act and to satisfy his own end, his accomplice in the felony is not guilty of murder in the first degree. . . . If the lethal *act* is in furtherance of their common purpose, the accomplice is guilty even though there was an express agreement not to kill, and even if he actually attempts to prevent the homicide. · · ·

There is no basis for believing that the D.C. felony-murder statute goes beyond its common law origins and is thereby different from others in effect around the country. Further action by Congress would be necessary to that end. As the Pennsylvania Supreme Court put it in *Redline*, 137 A.2d 472, 474 (1958):

> If predominant present-day thinking should deem it necessary to the public's safety and security that felons be made chargeable with murder for *all* deaths occurring in and about the perpetration of their felonies—regardless of how or by whom such fatalities came about—the legislature should be looked to for competent exercise of the State's sovereign police power to that end, which has never yet been legislatively ordained.

■ Thus it would seem that the felony-murder instruction which has

been used in this jurisdiction, as well as the one proposed for use by the Junior Bar Association, reflect an understanding that the statute embraces occasions when the jury may properly be urged to find that the homicidal act fell outside the scope of the felonious crime which the parties undertook to commit. It was error for the trial court to forbid counsel to argue this to the jury; [11] and the felony-murder convictions of the Walker brothers must be reversed.

## IV

Appellants Frank and David Walker also contend that a new trial is necessary because the trial judge denied their motion for a severance from appellant Heinlein. At a pretrial hearing and again at the start of trial, the Walkers moved for severance on the ground that the case against Heinlein was much stronger than the evidence against them. In further support of their motion, they argued that severance was necessary to enable them to present evidence that Heinlein was likely to use a knife with little provocation and for no rational purpose.[12]

The asserted disparity of the evidence against Heinlein as compared with appellants does not, in our view, require reversal. The evidence against one defendant must be far more damaging than that against his co-defendant before the risk of transference of guilt from one defendant to the other is sufficient to require severance.[13] On our facts there was no misidentification problem insofar as Heinlein was concerned, and Harding said that it was Heinlein who stabbed McQueen. In those and other similar respects the case was stronger against Heinlein than against his codefendants, but severance would have afforded the Walkers little benefit. Under the felony-murder doctrine, the Walkers are to be held responsible for acts committed by Heinlein in furtherance of the felony; therefore, the evidence concerning Heinlein's actions would also have been admissible in

11. This case differs from United States v. Carter, 144 U.S.App.D.C. 193, 445 F.2d 669 (1971), cert. denied, 405 U.S. 932, 92 S.Ct. 988, 30 L.Ed.2d 806 (1972), wherein a felony-murder conviction emanating from a homicide committed by another was sustained. In that case, the Government's evidence tended to show that Carter participated in an armed robbery of a cab driver during the course of which one Whiteside shot him, and that Carter later complained that the killing was unnecessary to consummation of the robbery. Carter claimed that Whiteside shot the cab driver impulsively and then robbed him, and that Carter had nothing to do with either planning or carrying out the robbery. The instruction given the jury— essentially the same as that given here—was not objected to, nor was the issue raised in any way. Defense counsel explicitly professed to be satisifed with the instruction as given. More importantly, however, his argument to the jury was that his client had not participated in any way in the felony of robbery and that, indeed, there had been no robbery or plan of robbery until after the slaying.

In that milieu, a majority of the panel did not consider the difference in jury instructions significant enough to warrant reversal on a plain error basis. The evidence as a whole and the judge's instruction permitted the jury to find either that Carter had or had not shared a pre-shooting purpose to rob the cab driver, and to adjudge his guilt or innocence accordingly. But the state of the evidence was such that a factual finding of an unforeseeable shooting in the course of an armed robbery of the driver seemed irrational, with the result that a furtherance-of-the-purpose instruction could hardly have affected the verdict. In the case at bar, however, the Walkers not only requested such an instruction but were prevented from arguing their theory to the jury.

12. There is no question that the charges against appellants were properly joined in one indictment under Rule 8(b), Fed.R. Crim.P. The claim is founded upon Rule 14, which says that the court *may* grant a severance if either a defendant or the prosecution is prejudiced by the joinder. We have held that such a motion for severance " . . . [is] addressed, to the trial court's discretion, subject to review only for clear abuse . . ." Robinson v. United States, 93 U.S.App.D.C. 347, 349, 210 F.2d 29, 32 (1954).

13. *Cf.* Blumenthal v. United States, 332 U.S. 539, 560, 68 S.Ct. 248, 92 L.Ed. 154 (1947); McHale v. United States, 130 U.S.App.D.C. 163, 398 F.2d 757, 758 (1968).

a separate trial of the Walker brothers. *See* United States v. Mack, 151 U.S. App.D.C. 162, 466 F.2d 333, 338–339, cert. denied, 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972).

The Walkers' second ground for requesting severance was their desire to introduce evidence that Heinlein had pulled a knife on a waitress on the weekend of the stabbing of McQueen. They argue that this evidence would have tended to prove that Heinlein was fast and impetuous with a knife, and that his conduct was unpredictable. All of this would have supported their theory that the stabbing of McQueen was Heinlein's independent response to being slapped.

The same interpretation of felony-murder which led the District Court to refuse the Junior Bar instruction and to restrict the scope of counsel's closing argument seems also to have influenced its view of the importance of evidence of the incident with the waitress. The following exchange between court and counsel evidences this fact:

> COURT: Of course, from the legal point of view, if your client was aiding and abetting in that rape, it doesn't make any difference how illogical Mr. Heinlein was if he stabbed her.

> [DEFENSE COUNSEL]: It makes the world of difference. . . . If it was because of an insult, because it was a slap, if it was irrational of the Defendant Heinlein, then none of the other people, if they participated in the rape, would be guilty of the felony-murder. The instruction would be itself . . .

> COURT: I don't think so.

Thus the trial judge does not seem to have recognized the importance of this evidence to the felony-murder issue, and his ruling on the motion for severance may therefore have been erroneous. But since the probative value of the evidence involved is disputed,[14] and since on the present record we cannot make an adequate evaluation of that factor, we express no opinion as to whether the motion could properly have been denied despite the relevance of the evidence to the felony-murder defense. We leave that determination in the first instance to the trial judge should the question arise in a new trial.

The convictions appealed from are affirmed with the exception that in Nos. 23,227 and 23,228 the convictions for felony-murder are reversed.[15] In No. 23,226 the sentence of death is vacated and the District Court is directed to im-

14. There is an intimation in the record that the waitress would testify that one of the Walkers was present at the knife-pulling incident. If true, this would weaken the significance of the evidence for the purpose for which it was sought.

15. The Walker brothers' convictions of assault with intent to commit rape while armed elicited for each the maximum sentence of fifteen years to life. 22 D.C.Code § 3202. Since the events which led to these convictions occurred in the context of appellants' chronic alcoholism, one might wonder what the impact of their approximately five years of incarceration thus far has had upon that condition, bearing in mind that under their present sentences they cannot be considered for parole for another ten years. We note in this regard that the Board of Parole has been authorized by Congress to apply to the sentencing court for a reduction of the minimum sentences should the Board conclude that there is a reasonable probability that an earlier release would not be incompatible with the welfare of society. 24 D.C.Code § 201c. Of course that decision is committed to the discretion of the Board, and is to be made on the basis of appellants' responses to the rehabilitation program.

Appellant Heinlein stands convicted of felony-murder and is under a mandatory sentence of life imprisonment. 22 D.C.Code § 2404 provides that "notwithstanding any other provision of law, a person convicted of first degree murder and upon whom a sentence of life imprisonment is imposed shall be eligible for parole only after the expiration of twenty years. . . ." This language appears to render the provisions of § 201c inoperative as to appellant Heinlein, thereby leaving executive clemency as the only means by which his sentence could be reduced, should his progress in rehabilitation, absent the availability of alcohol for an extended period, make such action desirable.

pose a life sentence in respect of the felony-murder conviction.

It is so ordered.

FAHY, Senior Circuit Judge (concurring as explained):

I concur in reversal of the convictions of the Walkers of felony-murder, and in affirmance of the other convictions.

I also concur in Parts I and II of the opinion of the court.

As to Part III of the opinion, concerned with the felony-murder problem, had the District Court permitted counsel for the Walkers to make the argument he proposed, the error in the instructions on felony-murder as it affected them might have been overcome, but the judge correctly interpreted his instructions to preclude the argument. The error as I view the matter was in the instructions themselves, in not qualifying the jury's right to find the Walkers guilty of felony-murder for a killing they did not commit, by requiring that under the principle of aiding and abetting the jury must find that the killing by Heinlein was within a purpose or plan common to the Walkers with Heinlein in the attempted rape, not an independent act of Heinlein. The omission of such an instruction in Carter v. United States, 144 U.S.App.D.C. 193, 445 F. 2d 669 (1971), cert. denied, 405 U.S. 932, 92 S.Ct. 988, 30 L.Ed.2d 806 (1972), was the basis of the dissent in that case (Fahy, J., concurring in part, dissenting in part, 144 U.S.App.D.C. at 197, 445 F.2d at 673).

In aid of the application and administration of our felony-murder statute in the future it seems desirable to call attention to the difference between the present decision and the fairly recent decision in Carter. Carter was tried for robbery and felony-murder. The killing

of the cabman who was being robbed was not by Carter but by his co-felon in the robbery, Whiteside. Under the evidence the jury could have found that Carter was not guilty of felony-murder, of which he was convicted, had the jury been instructed under the common purpose criterion applicable to that offense when another of the robbers kills the victim. The *Carter* majority declined to take this view of the law, stating that although "[i]t may be true that the ultimate tragedy of the cab driver's senseless murder was far from appellant's [Carter's] mind," nevertheless:

> . . . under our statutory law, his [Carter's] participation in the robbery resulting in a killing made him guilty of murder in the first degree, of which he was duly convicted.[8]

> 8. This is so even though appellant was the accomplice of Whiteside, who did the actual shooting. 22 D.C.Code § 105. In pertinent part, 22 D.C.Code § 2401, defining first degree murder, reads:
> Whoever, being of sound memory and discretion, . . . without purpose so to do kills another in perpetrating or attempting to perpetrate any . . . robbery . . . is guilty of murder in the first degree.

144 U.S.App.D.C. at 196–197, 445 F.2d at 672–673.

The instructions in *Carter* on felony-murder had included the following:

> Under the circumstances of this case, the elements of the offense of murder in the first degree which the Government must prove . . . are as follows:

> . . . . . .

> (4) That the killing was within the scope of the robbery or attempted robbery which Whiteside and [appellant] undertook to commit, if you find they so undertook to do so.

144 U.S.App.D.C. at 198, 445 F.2d at 674.[1]

1. The instructions in *Carter* also included the following:
   If two or more persons acting together and jointly are perpetrating a robbery or are attempting to perpetrate a robbery, and one or more of them, in the course of

the robbery or attempted robbery, kills another person, then all the persons involved in the robbery or attempted robbery are guilty of murder in the first degree.

Even if the common purpose argument could have been advanced under this part of the instructions of the District Court in *Carter*, the argument would have been inconsistent with the majority position taken by the court on the appeal in that case. The majority, erroneously the dissenting opinion urged, adhered to the position that Carter was guilty of felony-murder if Whiteside killed the cabman in the course of the robbery in which both participated, all else aside. The court now departs from *Carter*, properly I think.[2]

The addition by the court in the present opinion of the concept of the natural and probable consequences of the acts done in perpetration of the felony I think is appropriate if read consistently with the basic concept of a common purpose or plan. The felony-murder statute, in its application to a co-felon who does not commit the homicide, should not be extended beyond the confines of the law of aiding and abetting.

As to Part IV of the opinion, the contention of the Walkers based on denial of their motion for a severance, I consider now in light of our reversal of their convictions of felony-murder and our affirmance of Heinlein's conviction of that offense. It follows that should the Walkers be retried for felony-murder Heinlein would not be tried with them. The severance problem is thus limited now to its bearing upon the convictions of the Walkers for the attempted rape. The motion for severance was based primarily, however, upon evidence with respect to conduct of Heinlein deemed prejudicial to the Walkers in

their trial with Heinlein for felony-murder. The convictions of the Walkers for only assault with intent to commit rape while armed[3], I think, were not significantly affected by the joint trial with Heinlein for that offense. The denial of the motion for severance accordingly is not ground for reversal of those convictions of the Walkers which are affirmed.

If one person is perpetrating or attempting to perpetrate a robbery and one or more other persons aids and abets him in so doing, and the first of these persons in the course of the robbery or attempted robbery kills a human being, then the person or persons who aided and abetted him in the robbery or attempted robbery and the person who committed the killing are both equally guilty of murder in the first degree.

2. Footnote 11 of Judge McGowan's opinion for the court is puzzling in light of what

was considered and held in *Carter*. The reasons now assigned for the affirmance of Carter's conviction of felony-murder do not appear in the majority opinion in that case and I suggest would not have justified affirming his conviction of first degree murder had the majority deemed the instruction on felony-murder not to be correct with respect to a co-felon in Carter's situation.

3. Referred to hereinabove, for short, as the attempted rape.