**UNITED STATES of America**

v.

**Margaret MACKIN, a/k/a Margaret Nelson, Appellant.**

**UNITED STATES of America**

v.

**Erana Mae GIBSON, a/k/a Erana Horton a/k/a Lorana Horton, Appellant.**

**Nos. 72–1948, 72–1949.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1973.

Decided July 18, 1974.

Rehearing Denied Aug. 16, 1974.

Certiorari Denied Dec. 9, 1974.

See 95 S.Ct. 629.

---

Joseph Paull, Washington, D. C. (appointed by this Court) for appellants. Donald A. Kettlestrings, Washington, D. C. (appointed by this Court) also entered an appearance for appellants.

N. Richard Janis, Asst. U. S. Atty. with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Stephen W. Grafman, Asst. U. S. Attys., were on the brief for appellee.

Before TAMM, MacKINNON and ROBB, Circuit Judges.

ROBB, Circuit Judge:

The appellants Margaret Mackin and Erana Mae Gibson were convicted by a jury of first degree premeditated murder (22 D.C.Code § 2401), first degree felony murder (22 D.C.Code § 2401), and robbery (22 D.C.Code § 2901). The District Court sentenced each appellant to life imprisonment on each murder count and a term of three to fifteen years on the robbery count, all sentences to be served concurrently. We affirm the judgments.

I.

The crimes charged in the three counts of the indictment were the murder and robbery of Mrs. Blanche Porter. Mrs. Porter, a 74-year old widow, suffered from generalized arthritis, partial deafness, partial blindness, obesity, and loss of bladder and bowel control. She had great difficulty in moving about, getting out of bed, or standing up, and even with the aid of a walker was unable to walk more than a short distance, such as the distance from her room to the bathroom. From 1967 until her death on October 8, 1971, she lived at the Nelson Nursing Home in northwest Washington. At the time of her death Mrs. Porter was the only patient in the home, which was managed by the appellant Mackin.

Mrs. Porter's sister-in-law, Mrs. Eva Curtis of Forestville, Maryland, was the only relative of Mrs. Porter who saw her regularly. On October 7, 1971 around 7:00 P.M. Mrs. Curtis telephoned Mrs. Mackin and told her that Mrs. Porter's seventy-fifth birthday was approaching and that the next day, October 8, Mrs. Curtis was going to come in a cab and take Mrs. Porter out for a birthday luncheon. Mrs. Curtis asked Mrs. Mackin to have the old lady dressed and ready and tell her Mrs. Curtis was coming for her. Mrs. Mackin said she would do this.

About half-past seven on the morning of October 8 Mrs. Mackin called Mrs. Curtis and told her "Mrs. Porter doesn't want you to come up today. She is

going out with a friend." Mrs. Curtis responded "I didn't know she had any friends. Where is she going?" Mrs. Mackin replied "I don't know. She told me to call, and she is going out with friends." When Mrs. Curtis asked if Mrs. Porter had been told of the plan to take her out to lunch Mrs. Mackin said "Yes," but "[d]on't come up. She will not be home." Mrs. Curtis called Mrs. Mackin again at four o'clock that afternoon and asked if Mrs. Porter was home yet. Mrs. Mackin replied "She has not come in yet." At nine o'clock that evening Mrs. Curtis called again to ask Mrs. Mackin if she had heard anything from Mrs. Porter. Mrs. Mackin replied "Yes, I heard from her, and she will be home in a couple of days."

On the morning of October 8, 1971 the police found the body of a white female floating in the Anacostia River near the Sousa Bridge in southeast Washington. The body was clothed in a black robe, a green gown, blue underclothing and black slippers, and there was one ring on the right ring finger and a Timex watch on the left wrist. The police estimated the age of the dead woman as between forty to fifty years, and this estimate was recorded in the description of the body when it was received at the morgue. From an autopsy the medical examiner concluded that the cause of death was drowning and that the body had been in the water less than twenty-four hours.

The corpse that floated in the Anacostia River on the morning of October 8 was the corpse of Mrs. Blanche Porter, but as will be seen it was not identified until November 30.

On the afternoon of October 8 Mrs. Porter's son, James D. Haveron, who lived in California, telephoned to wish his mother a happy birthday. Mrs. Mackin answered the telephone. She told Mr. Haveron "Your mother has gone out . . . with a lady friend". She added that the birthday cards Mr. Haveron and his family had sent had arrived and Mrs. Porter would get them when she came home.

Since it was unusual for Mrs. Porter to go anywhere, and indeed Mrs. Curtis had not seen her outside without her walker for three years, Mrs. Curtis continued to call Mrs. Mackin every two or three days. Each time when Mrs. Curtis asked if there was any news from her sister-in-law Mrs. Mackin responded that she had not heard anything. On one occasion Mrs. Mackin seemed annoyed and said "I told you I would let you know the minute I hear anything."

Mrs. Curtis knew that Mrs. Porter's Civil Service retirement check arrived on the first of each month, and her Social Security check on the third of each month. On November 3 when Mrs. Curtis called and was told by Mrs. Mackin that both checks had arrived but Mrs. Porter had not returned, Mrs. Curtis started crying and said "Well, I am going to call her children and have the Missing Persons Bureau notified, because I know something has happened to her now." Mrs. Mackin said she was going to hold the checks "to see if she heard from Mrs. Porter."

LeRoy Haveron, a son of James Haveron, lived in Bethesda, Maryland. On November 3, after talking with his father and his aunt, Mrs. Curtis, he reported to the District of Columbia Police that Mrs. Porter was missing. He also called the Nelson Nursing Home and asked Mrs. Mackin if she had any news of his grandmother. Mrs. Mackin said she had no news but she had heard from Mrs. Porter, and she was all right.

As a result of LeRoy Haveron's report the Washington Police interviewed Mrs. Mackin on several occasions, beginning November 4. She told the police Mrs. Porter had driven off in a dark colored automobile with a woman who was unknown to Mrs. Mackin, and a day or two later Mrs. Porter had called and said "she would come back when she felt like it." Mrs. Mackin said she did not know where Mrs. Porter had gone.

On November 10, in response to a call from Mrs. Curtis, James Haveron came to Washington to search for his mother. He went to the Nelson Nursing Home

where Mrs. Mackin took him to Mrs. Porter's room. He noticed that Mrs. Porter's wheel chair and walker were still in the room, but there was no clue to her whereabouts. Mrs. Mackin told him Mrs. Porter's checks for the month of November had come and that she, Mrs. Mackin, had returned them to the senders with a notation "not here".

Before returning to California on November 13 James Haveron inquired at the morgue, describing his mother as a woman seventy-four years old. He was told there was no one answering that description at the morgue.

On the evening of November 30 Victor J. Haveron, another of Mrs. Porter's sons, and his wife Paula, went to the morgue and identified Mrs. Porter's body. On December 1 the Haverons went to the Nelson Nursing Home to pick up Mrs. Porter's insurance policy. They were met by Mrs. Mackin who found the policy for them. Without letting Mrs. Mackin know that Mrs. Porter's body had been found they asked if she was sure it was Mrs. Porter who had called her on October 8. Raising her voice Mrs. Mackin replied "Yes, don't you think I know your mother. She lived with me for four years."

The circumstances of Mrs. Porter's disappearance and death did not become known to the police until January 1972, when Antonia Johnson and her husband George made statements to investigating officers. We summarize their story, as recounted in their statements and repeated in testimony at the trial.

The Johnsons were narcotics addicts who, as Antonia Johnson testified, supported their habit by "stealing, robbing, selling dope, just everything." They were acquainted with the appellant Erana Gibson who occupied an apartment near theirs. Early in October 1971 Mrs. Gibson told the Johnsons that "my godmother has this nursing home, and there is this old bitch that knows too much that we got to get rid of." To carry out this project she wanted to rent the Johnsons' car for $50.00. The Johnsons did not accept Mrs. Gibson's proposal at that time.

On the night of October 7 Mrs. Gibson renewed her proposition, asking "What about tonight, can I use the car tonight?" She explained that she "wanted to go get the old broad" and "drive her into the woods somewhere, and leave her, because she couldn't walk very well." She offered to pay the Johnsons $100, which she said she would obtain from her godmother. The Johnsons accepted this proposal and the three went to the Nelson Nursing Home, George Johnson driving and Mrs. Gibson directing him.

The Johnsons and Mrs. Gibson arrived at the nursing home shortly before midnight. Mrs. Gibson went into the house, saying "I'm going to get the old broad". A few minutes later she and Mrs. Mackin came out with Mrs. Porter between them. They held her arms, helping her to walk, and put her in the back seat of the car, Mrs. Porter sitting in the middle with Mrs. Mackin and Mrs. Gibson on either side. Mrs. Porter said she "felt bad", asked when she was going to "get to the hospital" and complained that her "arthritis was bothering her". Mrs. Gibson told her "Now don't worry; we will get there."

After Mrs. Porter had been placed in the car Mrs. Gibson said "Let's go to Maryland somewhere, where it is dark". George Johnson then drove aimlessly for an hour or so and finally stopped the car on a dirt road under the Sousa Bridge in Washington. Mrs. Porter kept saying "When are we going to get to the hospital? This is a long time to get to the hospital." Mrs. Gibson reassured her, calling her "dear", but told her to get out of the car because "the man got a flat." Mrs. Mackin and Mrs. Gibson helped the old lady out of the car and walked her toward the Anacostia River. Then there was a gasp and a splash and Mrs. Mackin and Mrs. Gibson returned to the car, without Mrs. Porter. Mrs. Gibson showed the Johnsons two rings which she said she had got from the old

lady and was going to keep; and she gave the Johnsons a "brand new" one-hundred dollar bill which she got "from her godmother."

After the murder the Johnsons took Mrs. Mackin back to her nursing home and then went to the Johnsons' apartment in the Mt. Pleasant area of Washington. Just as they arrived there Mrs. Gibson, noticing that Mrs. Porter's purse was still in the car, went through the purse, took some small change, said "Let me get rid of it" and threw it into a nearby sewer.

On November 11, 1971 Antonia and George Johnson were arrested for armed robbery. While in the Detention Center Antonia received drug therapy and she brooded about the drowning of Mrs. Porter. As she testified at trial "I thought about it often, especially when I started to admit to myself I wanted to be for real and stop pretending and face myself . . . Stop living in a fantasy world of drugs . . . it didn't matter what it took out of my life, it didn't matter. If it took me the next twenty years to get together, I was going to start, for real, you know, stop being phony." This thinking led her to make a full confession to the police. She took them to the nursing home, to the bridge where Mrs. Porter had been murdered, to Mrs. Gibson's home, and to the sewer where Mrs. Gibson had thrown Mrs. Porter's pocketbook. The police recovered the pocketbook from this sewer. Without disclosing to George Johnson what his wife had told them, the police interviewed him, and he corroborated Antonia's statement in every detail.

Acting on the information given them by the Johnsons the police obtained arrest warrants for Mrs. Mackin and Mrs. Gibson, and they were arrested on January 17, 1972. When placed under arrest Mrs. Gibson was wearing two of Mrs. Porter's rings.

At trial it was stipulated that Mrs. Mackin endorsed the name of Blanche Porter on five checks that had been mailed to Mrs. Porter at the Nelson Nursing Home, as follows: a Civil Service retirement check dated October 1, 1971 for $163.00; a Social Security check dated October 2, 1971 for $119.50; a Civil Service check dated November 1, 1971 for $163.00; a Social Security check dated November 3, 1971 for $119.-50; and a Civil Service retirement check dated December 1, 1971 for $163.00.

Mrs. Mackin testified in her defense that she wanted Mrs. Porter to leave the nursing home because she "was an extremely difficult person to get along with," sometimes she "would be nice and the next time she couldn't be meaner." She was incontinent "but I believe she could have controlled herself much better" and sometimes Mrs. Mackin "would have to scrub her room there three times a day". According to Mrs. Mackin she asked Mrs. Curtis "over a dozen times" to remove Mrs. Porter but each time Mrs. Curtis "would promise to do so and then back out." Mrs. Curtis said she could not take Mrs. Porter in to live with her. So, said Mrs. Mackin, "I decided, or thought about asking someone with a car to take her to Maryland, if possible, and then leave her there so that she could be taken to her sister-in-law. I had thought of Forestville, Maryland, where her sister-in-law lived. In that area." "I asked Mrs. Gibson if she could obtain a car so that she [Mrs. Porter] could be taken in that general area and I knew her sister-in-law would have to take her in." The plan was to have Mrs. Porter "dropped off . . . in the Forestville area."

On the 7th of October, the appellant testified, Mrs. Gibson told her she had found someone who would pick Mrs. Porter up and take her out to Maryland, she had a man with a car and they would come and pick up Mrs. Porter. They did come around midnight. Mrs. Gibson and Mrs. Mackin went upstairs and Mrs. Mackin "told Mrs. Porter that she was going to leave. She came down the steps and we went out the front door." George Johnson was the man with Mrs. Gibson, who introduced Mrs. Mackin to him, saying "George, this is

Margaret." He and Mrs. Gibson helped Mrs. Porter down the steps and into the car. Then they drove off and left Mrs. Mackin standing on her porch.

Continuing her testimony, Mrs. Mackin said that sometime in the next two days after Mrs. Porter left, probably on the 8th of October, Mrs. Gibson had called her and said "they had driven around and around" and that finally "they got out" and Mr. Johnson and Mrs. Gibson and Mrs. Porter had "walked near a river" where "George told Mrs. Gibson to move and she . . . kind of turned and she saw his hands come up and give Mrs. Porter a push and Mrs. Porter went into the water."

Still on direct examination, Mrs. Mackin admitted lying to the police and to Mrs. Porter's relatives, because "I certainly was not going to be in a big hurry to tell them that their mother had been disposed of like that. I covered up and said that for as long a time that I could that she was away. I know it was a lie." Although she claimed she had signed Mrs. Porter's October checks at Mrs. Porter's request she admitted she had no authority to endorse the November and December checks. She endorsed them, and "stole the money", she said, because the license of the Nelson Nursing Home "had been lifted" in April of 1971 and she "needed the money" to make repairs so she could "reopen as a rooming house." Concluding her direct testimony she testified that in an earlier case she had been convicted of forging a check and placed on probation for a term of three years. Her probation expired in December 1971.

On cross examination Mrs. Mackin testified that she planned to have Mrs. Porter taken to "the Forestville area". She did not know where Mrs. Curtis lived but "hoped that [Mrs. Porter] would be taken near there." She had Mrs. Porter taken away at midnight because she "had to depend on someone to get a car." Asked why she did not call Mrs. Curtis to tell her Mrs. Porter was being taken to Forestville she replied

"You are asking me something I can't answer." She responded "I wouldn't know" when asked how she expected Mrs. Curtis to know that her sister-in-law was in the Forestville area. She said "there is no answer" when asked why she sent Mrs. Porter away without her clothes, her wheel chair or her walker. She admitted that as soon as Mrs. Porter left at midnight on October 8 she, Mrs. Mackin, noted on the nursing home records that "Mrs. Porter left with a friend on the 8th for a few days' visit." She knew this notation was untrue.

Mrs. Mackin testified she had known Mrs. Gibson "three or four years. Maybe five" and they were close friends. She denied that Mrs. Gibson referred to her as her godmother but conceded that she was the godmother of one of Mrs. Gibson's children.

Taking the stand in her own behalf Mrs. Gibson testified that she had known Mrs. Mackin for four or five years. Her mother had been a patient at the nursing home and her husband had done plastering and other work there. She said Mrs. Mackin had called her and told her "She wanted a woman to be taken to Maryland, that her people had refused her and she was tired" and if the woman were taken "to Maryland close to where she lived at" they would find the woman and take her back. According to Mrs. Gibson she asked George Johnson in the presence of his wife Antonia, if he would take the lady to Maryland and he said he would, but not for nothing. Mrs. Gibson said she would give him $75.00 or $100.00. She claimed that she spoke to the Johnsons only once about the project.

Mrs. Gibson said she and George and Antonia Johnson went to the Nelson Nursing Home in the Johnson car. Mrs. Gibson "told him how to get there". When they got there Mrs. Gibson and Mrs. Mackin went upstairs, "brought the lady down the steps" and then with the help of George Johnson put her in the car. Mrs. Gibson and the Johnsons drove off with Mrs. Porter, leaving Mrs.

Mackin at the home. Mrs. Gibson told George Johnson they were supposed to take Mrs. Porter to Forestville, that was somewhere in Maryland, and he said he knew where that was. They drove around a long time and finally stopped on a dirt road by a bridge. Johnson said "You all are going to have to get out because I have a flat tire." He and Mrs. Gibson helped Mrs. Porter out and walked with her over "by the seawall." They "walked over there . . . because she could not stand up, like standing, you know, in the center without some sort of support. So she had placed her hand up against this wall and this is where she was standing." George Johnson then told Mrs. Gibson to move, pushed Mrs. Porter into the river, ran back to the car, started it and began to move off while Mrs. Gibson was still climbing in. Then he said "Hand me the pocketbook" and when she reached for it she "heard the rings drop at that time, and they hit me on the foot. So I handed him the pocketbook, and I picked up the rings." Antonia Johnson told her to keep them because she had a ring and later Mrs. Mackin told her to keep them.

Mrs. Gibson denied that she searched through Mrs. Porter's purse and threw it in the sewer. She admitted that when arrested she was wearing Mrs. Porter's rings, and that she had lied when she told the police Mrs. Mackin had given her the rings "about six months before that." She also admitted she had lied when she told the police she knew nothing about Mrs Porter's death. She said she lied because she was "scared".

On cross examination Mrs. Gibson testified that the plan was to drop Mrs. Porter off close "to where the woman's people lived at"; but she did not know where these people lived, or even who they were. She was "just going to let this lady [out] in the park and leave her there on her own." She thought it not unusual that the woman was being taken at midnight, without any clothes, to some unidentified place in Maryland. Finally she swore that Mrs Mackin gave her the one-hundred dollar bill with which to pay the Johnsons.

We have related this sordid and horrible story so the contentions of the appellants may be understood and weighed in the context of the proof at trial. We turn now to those contentions.

## II.

The appellant Gibson claims that the warrant on which she was arrested was not supported by probable cause. Accordingly, she says, evidence that she was wearing Mrs. Porter's rings at the time of the arrest, and that she had lied about how she got them, should have been suppressed. We think her argument is without merit.

The appellant argues that the affidavit in support of the arrest warrant was deficient because it was "based on double hearsay", there was no statement as to how the informant received the information set out in the affidavit, and there was no showing that the informant was reliable. Having examined the affidavit, which is in the record, we find it quite sufficient to establish probable cause. Briefly the affidavit sets out an informant's account of the murder of Mrs. Porter, substantially as that story was developed in the testimony of the Johnsons at trial. Although the affidavit refers to the informant as the "source" or "it", and is phrased in the awkward prose frequently employed in such documents, it is apparent that the informant was an eyewitness to the events described. The affidavit recites that the informant has "proven reliable . . . on numerous occasions that have led to arrests", and that the police recovered Mrs. Porter's purse in the sewer where the informant said it had been thrown. In addition, the statements of the informant are plainly declarations against interest, a sign of their reliability. Finally, as the affidavit indicates, the informant's statements are consistent in many respects with what the police had already learned in their investigation of the disappearance of Mrs. Porter. We think the affidavit

on its face was plainly sufficient. United States v. Harris, 403 U.S. 573, 91 S. Ct. 2075, 29 L.Ed.2d 723 (1971); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

■ The appellant Gibson also contends that the District Court should have granted her motion for a mistrial because Mrs. Johnson, asked on direct examination "During this period of time, what was your relationship to Mrs. Gibson?", responded that Mrs. Gibson had sold heroin to her. The question referred to the time when Mrs. Gibson retained the services of the Johnsons and their automobile to transport Mrs. Porter. Overruling the motion for a mistrial the district judge immediately instructed the jury "You will ignore the question and the answer. The court strikes it from the record." Assuming that the reference to Mrs. Gibson's sale of narcotics was error we think it was cured by the prompt and decisive action of the district judge.

■ Whether to declare a mistrial or to deal with the error by an instruction to the jury was a matter within the court's discretion. United States v. Carter, 144 U.S.App.D.C. 193, 445 F.2d 669 (1971); Hardy v. United States, 119 U.S.App.D.C. 364, 343 F.2d 233 (1964), cert. denied, 380 U.S. 984, 85 S. Ct. 1353, 14 L.Ed.2d 276 (1965); Brown v. United States, 380 F.2d 477 (10th Cir. 1967); United States v. Giallo, 206 F.2d 207 (2d Cir. 1953), aff'd, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954). In reviewing the proceedings this court must decide whether it was "highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict." Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). "The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." Gaither v. United States, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969) [footnotes omitted].

We cannot say that this case was a close one, that the narcotics issue was central to the case or that inadequate steps were taken to mitigate the error. We believe and hold that in view of the overwhelming evidence of guilt any prejudice suffered by the appellant could have had no substantial effect or influence on the verdict.[1]

### III.

■ The evidence disclosed that while interviewing Antonia Johnson on January 13, 1971 the police showed her a single photograph of Mrs. Mackin "to make sure we were all talking about the same person." A single photograph of Mrs. Mackin was also shown to George Johnson. The appellant Mackin now argues that the exhibition of her photograph in these cicumstances irreparably tainted the identifications made by the Johnsons in the courtroom. We do not agree.

The District Court held hearings on the appellant's motion to suppress her identification by the Johnsons. In these hearings the Johnsons testified at length about their observations of Mrs. Mackin during their activities on the night of the murder, beginning when Mrs. Mackin helped Mrs. Porter down the steps of the nursing home, and including the long automobile ride, a stop at a filling station for gasoline, the stop at the river, and the drive back to the home. The court determined and found that there was an independent source for each identification. With respect to Antonia Johnson the court said: "Here, over a period of approximately an hour and a half, according to the testimony of Mrs. Johnson, there were a number of different occasions on which Mrs. Johnson looked up at the defendant, perhaps five

---

1. Appellant Gibson also complains about other testimony of Mrs. Johnson, to the effect that on the night of the murder part of the $100 received by the Johnsons was used to buy narcotics, some of which the Johnsons and Mrs. Gibson administered to themselves. This testimony was received without objection and was not the ground of the motion for a mistrial.

in number, periods of the observation was [sic] varied from one to two minutes to a somewhat longer period. During none of these times was the Defendant Mackin wearing a mask or any other covering". As for George Johnson's identification the court noted that he had an even "better opportunity . . . to observe Mrs. Mackin . . . than his wife." We think the court's finding of an independent source is supported if not compelled by the evidence.

The question is whether showing the photograph of Mrs. Mackin to the two witnesses resulted in "a very substantial likelihood of irreparable misidentification". Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L. Ed.2d 1247 (1968). The answer is that it did not but that under "the totality of the circumstances", and notwithstanding the showing of the photograph, the identifications were reliable. Neil v. Biggers, 409 U.S. 188, 199, 200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). We agree with the district judge that the circumstances of the present case are significantly different from those of United States v. Gambrill, 146 U.S.App.D.C. 72, 449 F.2d 1148 (1971) relied upon by the appellant. In that case the victim of a rape had only a brief opportunity to observe her assailants, in a poor light, when they were wearing masks, and the victim, who made a courtroom identification, had been completely unable to identify one of the defendants at a lineup.

■ Although the District Court with commendable care explored the circumstances of the identifications we note that there was never any contention that someone other than Mrs. Mackin assisted George Johnson and Mrs. Gibson in putting Mrs. Porter in the Johnsons' car. As we have said Mrs. Mackin testified that she was introduced to George Johnson at this time. Any suggestion of mistaken identification therefore has a hollow ring, for in fact the issue was one of veracity between the Johnsons and the appellants, rather than one of identification. See United States v. Garner, 162 U.S.App.D.C. ——, 499 F. 2d 536 (1974).[2]

■ The appellant Mackin says she was prejudiced because her chief counsel had a conflict of interest, in that he had represented one Williams, a co-defendant of the Johnsons in an armed robbery case in which all had pleaded guilty to a charge of robbery. Mrs. Mackin says:

[I]t is conceivable that inasmuch as the robbery took place at a date close

---

2. Counsel for the appellant also suggests that George Johnson's in-court identification was tainted by an in-court lineup in which "Mrs. Mackin was the only gray-haired white woman present." Before George Johnson began his testimony at the hearing on the motion to suppress the court offered to conduct a lineup in the courtroom, and to allow Mrs. Mackin's counsel to choose the participants. After some sparring the appellant's counsel rejected the offer. The appellant was then removed from the courtroom while George Johnson testified on the motion. When the court ruled that there was an independent source for Johnson's identification counsel reconsidered and asked for a lineup. Rejecting this belated request for a formal lineup the court directed that counsel might "place Mrs. Mackin any place you wish to in the court" and Mrs. Mackin took off her glasses and sat in the spectator gallery beside two white women of approximately the same age. Johnson was then brought into the courtroom.

and according to the transcript the following occurred:

THE COURT: Mr. Johnson, will you stand and walk around the courtroom and see if you recognize anybody that you saw on the night of this occasion concerning which you have given testimony?

(The witness Johnson slowly walked first to the left-hand side spectator gallery and then to the right-hand side spectator gallery.)

WITNESS JOHNSON: Yes, sir.

THE COURT: All right, will you point to that person.

(Witness Johnson pointed to Defendant Mackin seated in the spectator gallery.)

Although photographs indicate that the women sitting beside Mrs. Mackin did not have gray hair this circumstance did not undercut the court's previous finding of an independent source for the identification testimony.

to that of the drowning, since Williams was a confessed confederate in the robbery, he [counsel] might have had some knowledge as to the Johnsons' participation in the drowning or might have heard some statement that the Johnsons had made to Williams. If so, he could not ethically disclose this to Mrs. Mackin or to the Court. The appellant's contention must be rejected. The charge of prejudice is speculative, without even gossamer support in the record. Moreover, the record discloses that the appellant's chief counsel and his co-counsel vigorously and ably defended the appellant. Campbell v. United States, 122 U.S.App.D.C. 143, 352 F.2d 359 (1965), cited by the appellant, is not in point. In that case the record plainly showed that a defendant was prejudiced because he and a co-defendant were represented by the same lawyer.

## IV.

Both appellants argue that the District Court "erred in curtailing cross-examination of the informants on their claim that they did not turn state's evidence to escape a murder charge or to obtain more favorable treatment on other charges." In support of this argument the appellants cite only a ruling of the District Court which curtailed cross-examination of Mrs. Johnson about her hope of receiving a sentence under the Youth Corrections Act. The record establishes that the appellants' contention has no merit.

George Johnson testified that in November 1971 he was indicted for armed robbery, robbery, assault with a dangerous weapon, and carrying a dangerous weapon. He entered a plea of guilty to robbery and the court record reflected that the other charges would be dismissed. In another case in November 1971 he was indicted for burglary in the first degree while armed, armed robbery, robbery and assault with a danger-

ous weapon. He entered a plea of guilty to petty larceny and again the court records indicated that the other charges would be dismissed. He testified that he knew he could get a life sentence on the charges alleged in the indictment.

Mrs. Antonia Johnson testified that she had been indicted along with her husband and also had entered pleas of guilty to robbery and petty larceny in the two cases. She knew the charges in the indictment exposed her to a possible life sentence. In addition, she had been charged with a violation of the Harrison Narcotic Act but was permitted to plead guilty to a misdemeanor under the Uniform Narcotic Act. The Johnsons had not been sentenced in any of the pending cases nor had they been charged with anything in connection with the murder of Mrs. Porter.

Mrs. Johnson testified that she knew her pleas of guilty subjected her to a possible sentence of "17 years in prison". She also had been informed that since she was twenty-one years old she "could get the Youth Corrections Act" which meant to her that she could get "[s]ix months to six years." She was then asked "isn't it a fact that you know, Mrs. Johnson, that you can get out on the street earlier if you are sentenced under the Youth Corrections Act?" She responded "If I were to get out today, I wouldn't go out on the street, sir." The District Court thereupon curtailed further questioning concerning Mrs. Johnson's hope to receive Youth Corrections Act treatment.

From what has been said it is apparent that the appellants were able to put before the jury all the relevant facts tending to show that in talking to the police the Johnsons were motivated by the hope of reward. Further questioning of Mrs. Johnson could not have strengthened the inference of bias thus created—an inference that counsel for the appellants forcefully drew in their closing arguments to the jury.[3] In

---

3. In his argument counsel for Mrs. Mackin said :

As you will recall, the drug addicts have pending charges against them. These people

short, the appellants had every reasonable opportunity to prove bias and the trial judge then had the discretion to control the extent of the proof. Blair v. United States, 130 U.S.App.D.C. 322, 324–325, 401 F.2d 387, 389–390 (1968); Austin v. United States, 135 U.S.App.D.C. 240, 243, 418 F.2d 456, 459 (1969); Tinker v. United States, 135 U.S.App.D.C. 125, 127, 417 F.2d 542, 544, cert. denied, 396 U.S. 864, 90 S.Ct. 141, 24 L. Ed.2d 118 (1969). The trial judge did not abuse that discretion.

■ The appellants argue that "testimony as to the religious motivation of the witness Mrs. Johnson was improper and prejudicial". Specifically the appellants refer to (a) Mrs. Johnson's testimony that her conscience impelled her to talk to the police after she went to confession and told a priest that she had been involved in a murder; (b) the prosecutor's reference to this proof in his opening statement to the jury; (c) the "failure to disclose the evidence regarding Mrs. Johnson's renewed Catholic fervor . . . to defense counsel prior to the jury voir dire so that appropriate challenges to the array or to the veniremen could have been made"; and (d) the "failure of the Government to produce the priest who received the confession." The appellants say the matter of Mrs. Johnson's religious motivation "was sprung upon the defense in the Government's opening statement." Again we turn to the record to bring the appellants' contentions into focus.

On the *voir dire* of the prospective jurors the prosecutor identified as a possible witness "Father Raymond Maloney, who is sometimes known as Father Ray, a Catholic priest. . . ." Before he made his opening statement the prosecutor informed the court and counsel that:

. . . During the course of Mrs. Johnson's testimony, she is going to testify that she went to see a priest on Christmas Eve to a confessional; and this is when this thing first came out.

Now, I have put Father Malonson, [sic] the priest that she went to, on the capital list, [sic] However, I've talked with him and he feels very strongly that notwithstanding the fact that she is willing to waive her privilege, he feels that it would be a violation of his religious beliefs to testify under any circumstances regardless of the legal issue whether he could or could not testify.

\* \* \* \* \* \*

I will not bring a priest over his

. . .

THE COURT: All right.

. . . conscientious beliefs, but I just bring that to the attention of the defense if they want to argue a missing witness. He is available.

In response to this disclosure by the prosecutor counsel for the appellants stated "For the record, we will not ask for missing witness instruction on this priest." Thereafter in his opening

---

have had charges of armed robbery, drug charges. You heard the government say they had armed robbery charges and this has been reduced so Mrs. Johnson can plead guilty to a robbery. You heard Mrs. Johnson who was charged with the Harrison Narcotic Act and plead guilty to a misdemeanor.

These parties have a self-serving interest. Counsel for Mrs. Gibson argued that the furnishing of information by the Johnsons was part of

a devious, intentional plan, a methodical conception that I do something to cooperate, I will get some consideration.

Continuing, he said:

Do you really believe that all of the things you heard about what happened to the cases in which Mr. and Mrs. Johnson were charged had nothing to do with their testimony today?

\* \* \* \* \*

What does she get to plead guilty? Petty larceny; petty larceny.

They are also at gunpoint, armed robbery, life you can get for armed robbery. What did she plead guilty to? Robbery.

Don't think for a moment, for one scintilla of a moment that Mrs. Johnson and Mr. Johnson aren't aware. Don't think they are not aware that they were going to get something out of it, and indeed they have.

statement the prosecutor referred to Mrs. Johnson's confession to the priest. No objection was made to this reference, nor was any motion made to strike that portion of the opening statement.

On direct examination Mrs. Johnson testified without objection that she was a Catholic. The District Court however refused to allow her to testify that her confession to the priest prompted her to go to the police. The court ruled that the prosecutor might introduce this evidence on redirect, if the defendants sought to impeach Mrs. Johnson's testimony.

After the defendants had attacked Mrs. Johnson's credibility by suggesting that an expectation of leniency inspired her statement to the police the court permitted her to testify on redirect examination that her decision to talk was influenced by what happened at her confessional.

On this record the appellants claim that in some way the prosecutor violated their rights as established by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We cannot agree. In the *Brady* case the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. As the Court explained in Moore v. Illinois, 408 U.S. 786, 794, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) the "heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request". Assuming that the evidence here fell within the scope of the *Brady* rule, there was no suppression; on the contrary the defendants were told before trial, by way of the capital list, that a Catholic priest might be a witness, and this statement was repeated on the *voir dire* of the prospective jurors. Before the opening statement was made the appellants knew what Mrs. Johnson's testimony about

her confessional would be. There is no showing that the prosecutor's conduct was in any way unfair. Moreover, there is no showing, but only speculation, that the defense might have benefited if "evidence regarding Mrs. Johnson's renewed Catholic fervor" had been disclosed prior to the *voir dire* of the prospective jurors. Certainly we cannot say that earlier disclosure of this item of evidence would have been of critical or even substantial value to the defense. *See* Xydas v. United States, 144 U.S. App.D.C. 184, 191, 445 F.2d 660, 667, cert. denied, 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971).

The complaint that the government failed to produce Father Maloney as a witness is likewise without merit. His testimony would have been hearsay and in any event the appellants acquiesced in the prosecutor's decision not to call him. If the appellants had wanted him, he was available to them.

■ The appellants say the evidence was insufficient to support the jury's verdict on the count charging felony-murder. In evaluating this claim we "must assume the truth of the Government's evidence and give the Government the benefit of all legitimate inferences to be drawn therefrom," Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), and must view that evidence and inferential proof "in the light most favorable to the government's position." Crawford v. United States, 126 U.S. App.D.C. 156, 158, 375 F.2d 332, 334 (1967). "Moreover, when applying this standard, no legal distinction is made between circumstantial evidence and direct evidence." United States v. Fench, 152 U.S.App.D.C. 325, 333, 470 F.2d 1234, 1242 (1972), cert. denied sub nom., 410 U.S. 909, 93 S.Ct. 964, 35 L. Ed.2d 271 (1973). "It is only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the judge may properly take the case from the jury." United States v. Lumpkin,

145 U.S.App.D.C. 162, 168, 448 F.2d 1085, 1091 (1971).

Mrs. Johnson testified that she first noticed Mrs. Porter's rings when both appellants returned to the car after pushing Mrs. Porter into the Anacostia River, that Mrs. Gibson showed her the rings and said, "My husband never gave me anything this good," adding that she "was going to keep them". George Johnson also testified that Mrs. Gibson displayed the rings in the car, and said she "got them from the elderly lady" and " [s]he was going to keep them". As we have seen, when Mrs. Gibson was arrested she was wearing the rings.

From this evidence the jury could reasonably have concluded that the appellant Gibson took the rings from Mrs. Porter just before she and Mrs. Mackin pushed Mrs. Porter into the river, and that Mrs. Mackin, as an aider and abettor, was also guilty of murder in the perpetration of robbery. Mrs. Mackin was culpable, even though she did not share in the proceeds of the robbery. As the district judge rightly observed in denying a motion for judgment of acquittal "[I]f the jury feels there was aiding and abetting, that is enough to hold Mrs. Mackin on the robbery."

■ As their final argument the appellants claim that the District Court committed "plain error" in denying the jury's request to have certain testimony read to it. The request, set out in a note received from the jury during its deliberations, was this:

> We cannot reach unanimous agreement on Robbery charge; however, it is the opinion of a few they would like Tony Johnson's testimoney [sic] after Mrs. Porter was thrown into the river with reference to the rings.

> (We would like to know when the rings were discovered by the testimoney.) [sic]

Informed of the jury's request, counsel for the appellant Gibson stated: "I would strongly object to any rereading of the testimony. I would ask for the instruction that it is their recollection that counts." Counsel for Mrs. Mackin voiced no disagreement with this position. Accordingly, the court told the jury "You will have to trust to your recollection as to what Tony Johnson said. I am sure that if you think back over her testimony, you will be able to resolve that particular problem."

Whether to grant the jury's request was a matter within the sound discretion of the District Court. Salzman v. United States, 131 U.S.App.D.C. 393, 405 F.2d 358 (1968). Taking precisely the action urged upon it by counsel for the appellants, the court did not abuse its discretion.

The appellants had a fair trial, and the judgments must be and they are

Affirmed.

On Appellants' Motion For Rehearing

ORDER

PER CURIAM.

On consideration of appellants' motion for rehearing, it is

Ordered by the Court that appellants' aforesaid motion is denied.

ON MOTION FOR REHEARING

ROBB, Circuit Judge:

In their motion for rehearing the appellants claim the prosecutor "misinformed" the trial court as to the contents of the affidavit supporting the warrant for the arrest of Mrs. Gibson. This contention is now made for the first time by the appellants. According to them the prosecutor erroneously said the affidavit stated that a description of Mrs. Porter's rings, given by the informant before the arrest, was corroborated by Mrs. Porter's relative. The appellants say they "are unable to find any of this matter in the affidavit, which is in the court record."

The appellants cite a colloquy appearing on pages 233 and 234 of the trial transcript which they say reflects the prosecutor's misrepresentation.

In the colloquy cited by the appellants the prosecutor was speaking of the affidavit in support of a search warrant for Mrs. Gibson's apartment. This affidavit, which is in the record as Court's Exhibit 6, does contain the matter referred to by the appellants. The arrest warrant was supported by a separate affidavit, Court Exhibit 7. There was no misrepresentation by the prosecutor.

The motion for rehearing is denied.