Aubran Wayne MARTIN, Appellant,

v.

WARDEN, HUNTINGDON STATE CORRECTIONAL INSTITUTION and Attorney General of the Commonwealth of Pennsylvania, Appellees.

No. 80–1083.

United States Court of Appeals,
Third Circuit.

Argued Feb. 27, 1981.

Decided June 30, 1981.

William T. Whitaker, (argued) Elizabeth Reilly, Whitaker & Reilly, Akron, Ohio, for appellant.

Herman J. Bigi, Dist. Atty., Daniel L. Chunko, First Asst. Dist. Atty., (argued) Janet Moschetta, Asst. Dist. Atty., Washington County, Pennsylvania, Washington, Pa., for appellees.

Before GIBBONS and ROSENN, Circuit Judges, and HANNUM, District Judge.*

* Honorable John B. Hannum, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

OPINION OF THE COURT

ROSENN, Circuit Judge.

Aubran Wayne Martin appeals from the dismissal of his petition for a writ of habeas corpus. In his petition, Martin mounts several constitutional attacks on his conviction in Pennsylvania courts on three counts of first degree murder. The petition was referred to a United States Magistrate who, after a thoughtful analysis of Martin's claims and of the state record, concluded that the claims were without merit. The district court adopted the magistrate's recommendation and dismissed the petition. This appeal followed pursuant to 28 U.S.C. § 1291 (1976). We affirm.

### I.

On November 12, 1971, Martin was convicted by a Washington County, Pennsylvania, jury of the triple slaying of Joseph "Jock" Yablonski, his wife Margaret, and their 25-year-old daughter Charlotte. The Yablonskis had been shot to death while at home in the early morning hours of December 31, 1969, approximately three weeks after Joseph Yablonski had concluded a vigorous, bitter, and ultimately unsuccessful campaign for the presidency of the United Mine Workers of America. His campaign brought him national prominence. After the discovery of his and his wife's and daughter's bodies on January 5, 1970, the media carried the story of the sensational murders nationwide. The story continued to attract substantial media attention throughout the course of the criminal investigation.

Martin, Claude Edward Vealey, and Paul Eugene Gilly, all of Cleveland, Ohio, were charged with the Yablonski murders on or about January 22, 1970. Martin was at the time confined in a Warrensville, Ohio, correctional center on charges of disorderly conduct and resisting arrest. After a prolonged extradition fight, he was finally turned over to Pennsylvania authorities on June 9, 1971.

On June 23, 1971, Claude Vealey confessed to his part in the murders, naming Martin as the primary triggerman and Paul Gilly as the operation's mastermind. Gilly, Vealey stated, had been hired to kill Yablonski in the summer of 1969, and had enlisted Vealey and another acquaintance, James Phillips, to aid him in accomplishing his objective. The three men, in addition to "stalking" Yablonski on the United Mine Workers' campaign trail, made several trips to his Clarksville, Pennsylvania, home during the late summer and autumn of 1969. Sometime prior to November 1969, Phillips withdrew from the conspiracy. Vealey and Gilly continued their trips to Clarksville; at one time posing as unemployed miners, they even talked with Yablonski on his front steps. After yet another abortive effort on Christmas Day 1969, Gilly brought Martin into the plan. Martin was informed that the price on Yablonski's head was $5,200 to be divided equally among the three. On December 30, 1969, the new triumvirate made a final trip to the Yablonski home, where they ultimately carried out the murders.

According to Vealey's account, the three men arrived in Clarksville in the evening of December 30, 1969. Once there, they parked their car on a hill overlooking the Yablonski home and waited for the holiday activities at the house to break up and the guests to depart. Then, Vealey stated, the trio drove to the house, cut the telephone lines, disabled the Yablonski cars, and entered the Yablonski home. After checking the lower floor for occupants, the three made their way upstairs to the bedrooms.

In his confession, and again as the Commonwealth's principal witness at Martin's trial, Vealey claimed that when the trio reached the top of the stairs, he (Vealey) was carrying a semi-automatic carbine rifle and Martin held a .38 caliber pistol. The plan, as described by Vealey, called for Martin to enter Charlotte Yablonski's bedroom while Vealey stood in the doorway of her parents' bedroom. Both men were to fire simultaneously. The carbine, however, malfunctioned and Jock and Margaret Yablonski were awakened by the sound of gunshots coming from their daughter's room. Martin exited that room, observed

Vealey and Gilly struggling with the carbine, and fired his remaining four shots at Jock and Mrs. Yablonski. Vealey then took the pistol from Martin, reloaded it, and fired repeatedly into the bodies of the couple. As the trio left the house, Vealey claimed that Martin grabbed a money clip from the dresser containing $240 which they later divided. The three returned to Cleveland, disposing of their weapons and other paraphernalia along the way. By noon of December 31 they had "cashed in" on their contract and had gone their separate ways.

As might be expected, Martin's version of the events surrounding the Yablonski murders differs significantly from Vealey's. Martin, who testified in his own defense, claimed that he entered into a scheme with Gilly and Vealey to steal a coin collection worth $50,000 in Tennessee. He agreed to go along, he said, because Gilly guaranteed him $2,000. He asserted that it was not until the three men were en route on December 30 that he learned they were going to Pennsylvania and not Tennessee. Even then, he claimed, Gilly told him the change in destination became necessary because the coin collection had been moved. Neither murder nor "Yablonski" was ever mentioned, Martin testified.

Martin stated that he never entered the Yablonski home. He said he served only as a lookout and a getaway driver. Martin also testified that he did not learn of the murders until he heard radio news reports after the bodies were found.

The jury convicted Martin on three counts of first degree murder and recommended the death penalty. Martin was sentenced to death in 1973. He appealed to the Pennsylvania Supreme Court, which affirmed the convictions but vacated the sentence in light of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *Commonwealth v. Martin*, 465 Pa. 134, 348 A.2d 391 (1975). On remand, the court sentenced Martin to imprisonment for three consecutive life terms.

Martin structured his habeas corpus petition on essentially four points. First, he claimed that the pretrial publicity of the murders and his prosecution was so pervasive, sustained, and inflammatory as to prevent him from receiving a fair trial in Washington County. The trial court's denial of his motion for a change of venue, he claims, therefore amounted to constitutional error. Second, Martin charged that the trial court impermissibly limited the scope of voir dire questioning, and thereby failed in its duty to ensure that Martin's guilt would be judged by a fair and impartial jury. Third, Martin claimed that the court's instructions to the jury on the felony-murder doctrine were tantamount to a directed verdict, thus depriving Martin of his right to trial by jury. Finally, Martin alleged that he was not afforded the assistance of competent counsel. The district court carefully considered the first three claims and rejected them. As to the fourth, the ineffective assistance of counsel claim, the district court held that Martin had not exhausted his state remedies. We now review each of the claims.

## II. Pretrial Publicity and Change of Venue

Martin's claim that he was denied his sixth amendment right to a fair trial because the trial court denied his motion for a change of venue consists of two related arguments. First, Martin argues that the pretrial publicity was so sustained, pervasive, and inflammatory as to raise a presumption of prejudice within the venire and to require a change of venue even without proof of a nexus between the publicity and actual jury prejudice. Second, Martin argues that even if the scope of the publicity did not in itself require a change of venue, such a change was mandated because voir dire examination revealed widespread partiality or prejudice among the venire.

Extensive publicity of the Yablonski's murders began with the discovery of their bodies on January 5, 1970. On April 29, 1970, the trial court issued an order severely curtailing the flow of pretrial information

to the press.[1]   Although no violation of the order is demonstrated by the record, the volume of publicity attending developments in the case remained high.   The state court record contains a sheaf of over 150 newspaper clippings that were filed in support of Claude Vealey's motion for a change of venue in March 1971.[2]   These clippings range widely in their coverage of the case, detailing for instance the circumstances under which the victims' bodies were found, and reporting as well on testimony given by one of Yablonski's sons before a Senate subcommittee investigating mine safety.

In August 1971 Martin moved the court for funds to conduct a public opinion survey in Washington County.   Such a survey was necessary, he alleged, "to conclusively demonstrate to [the court] the biased and prejudicial attitude of the prospective jurors" in the case.   The trial court denied the motion in mid-October 1971, specifically mentioning that the results of the requested survey would presumably be used to support a change of venue motion.   The court noted in its opinion denying the motion the similarity between the publicity surrounding Vealey and the publicity surrounding Martin.   The court, stating that Martin was certainly entitled to make his own attempt at obtaining a change of venue, also observed that it had been earlier decided in the disposition of Vealey's motion that the media coverage had "not been legally offensive in tone nor viciously slanted."   The motion for funds was denied for lack of legal authority and because relevant law indicated that, in most instances, voir dire of prospective jurors was the most reliable method of ascertaining whether a change of venue was warranted.

On October 28, 1971, four days before the scheduled start of his trial on November 1, Martin filed a motion for a change of venue urging that the massive and inflammatory publicity in Washington County precluded the possibility of a fair trial there.   The court denied the motion as untimely[3] but agreed to conduct a hearing on the motion limited to publicity since noon October 21, 1971, the deadline for filing a timely change of venue motion.   The state record contains twenty-five newspaper clippings in support of Martin's change of venue motion.   Ten of these appeared before October 21 and therefore presumably were not considered

1.   The order stated in relevant part:
   Law enforcement personnel other than the elected District Attorney and the elected Sheriff are specifically forbidden to give any interviews to any news media concerning the proceedings during the pendency of such proceedings without the prior written approval of the President Judge.   By agreement with the County Commissioners, the members of the Commissioners' staff are likewise so forbidden.   Elected officials are advised that statements by them could prejudice the outcome of proceedings and the use of discretion is advised.
   During the pendency of the proceedings, no media representative or any person other than counsel of record shall interview any grand juror, juror or witness, for the purpose of publication of his testimony, attitudes or views regarding or in any way related to the proceedings whose pendency invokes these rules, and counsel of record are limited to those contacts permitted by the Canons of Ethics or by the Court.
   The contempt power will be exercised against any person, who, knowing that the proceedings are pending, disseminates by any means of public communication, an extra-judicial statement related to the defendant or to the issues in the case that goes beyond the public record of the court in this case, that is wilfully designed by that person to effect [sic] the outcome of the trial and that seriously threatens to have such an effect or make such a statement intending that it be disseminated by any means of public communication. . . .
   *Commonwealth v. Martin*, 465 Pa. at 148 n.3, 348 A.2d at 398 n.3.

2.   Vealey's motion and supporting materials were made a part of the record in Martin's case at the request of Martin's counsel.

3.   Pa.R.Crim.P. 305 (eff. 1/1/65) provides that "no pretrial application shall be considered if made less than 10 days before trial unless opportunity therefore did not exist or the defendant or his attorney was not aware of the grounds for the application."
   Martin now contends that a change of venue motion is timely if made anytime prior to the voir dire.   He did not, however, challenge the constitutionality of the trial court's ruling in his appeal to the Supreme Court of Pennsylvania.   *Commonwealth v. Martin*, 465 Pa. at 146 n.2, 348 A.2d at 397 n.2.   Thus, the issue is not ripe for our consideration because state remedies have not been exhausted.   *See* 28 U.S.C. § 2254(b) (1970).

by the trial court. The other fifteen articles consisted of

> one story which described picketing at the United Mine Workers headquarters in Washington, D.C., by supporters of Jock Yablonski; four relating to the denial of Martin's motion for continuance of the trial; one relating to an arrest of [Martin's] brother; and nine relating to the change of venue motion. In four of these fifteen articles mention is made of a statement given by Claude Vealey in June which had implicated Martin, three of the articles mentioning that implication.

*Commonwealth v. Martin*, 465 Pa. at 147, 348 A.2d at 397–98. After a hearing on November 1, the trial judge denied the motion, again stating that it could be raised and would be considered during or after voir dire of prospective jurors. Defense counsel did not, however, adopt that course and Martin's direct challenge, therefore, is to the November 1 decision.[4]

The Supreme Court of Pennsylvania sustained the trial court's denial of the motion because, first, it was untimely, and second, change of venue was not required. The court reviewed the record, including the pre-October 21 publicity supplied by Martin and Vealey, and found the media coverage to have been basically factual, not inflammatory. *Commonwealth v. Martin*, 465 Pa. at 146 n.2, 348 A.2d at 397 n.2. We agree.

Generally, a motion for a change of venue is addressed to the discretion of the trial court and a refusal to grant such a motion will not be set aside absent an abuse of discretion. *United States v. Addonizio*, 451 F.2d 49, 61 (3d Cir.), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *Commonwealth v. Rolison*, 473 Pa. 261, 266, 374 A.2d 509, 511 (1977). In a habeas corpus proceeding such as this, the inquiry narrows to whether the refusal to change venue amounts to a denial of the defendant's constitutional rights.

■ Martin's argument that the extensive pretrial publicity presumptively prejudiced the venire is without merit. "Pretrial publicity exposure will not automatically taint a juror." *United States v. Provenzano*, 620 F.2d 985, 995 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). *Accord, United States v. Feliziani*, 472 F.Supp. 1037, 1044 (E.D.Pa.1979), *aff'd*, 622 F.2d 580 (3d Cir. 1980). Even if a juror has heard about a case and has read allegations of a defendant's guilt, the juror nonetheless may serve if he or she is capable of laying aside prior impressions and rendering a fair verdict based on the evidence presented at trial. 620 F.2d at 995.

In *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), the Supreme Court reversed a conviction for unlawful distribution of prescription drugs because seven sitting jurors were exposed during the course of the trial to various news accounts of the defendant's conviction of forgery, and prior arrests for narcotics offenses and practicing medicine without a license. The Court held that persons who have learned from news sources such information with a high potential for prejudice are presumed to be prejudiced despite their assurances that they could remain impar-

---

4. As pointed out earlier in the text, Martin also strenuously argues that the responses elicited from prospective jurors on voir dire demonstrated that a change of venue was required. However, since no motion was made at that time, the argument is presented by way of an ineffective assistance of counsel claim. The magistrate declined to consider this claim, because it had not been the subject of proceedings under Pennsylvania's Post-Conviction Hearing Act ("PCHA"), 1966, Jan. 25, (1965) Pa. Laws 1580. The magistrate thus concluded that Martin had not exhausted his state remedies with respect to this claim. Because the PCHA is in the process of being repealed, *see* Act of April 28, 1978, 1978 Pa. Laws 202, No. 53 § 2(2), *as amended by* Act of June 26, 1980, 1980 Pa. Laws 265, No. 77, § 2, *as amended by* Act of June 26, 1981, 1981 Pa. Laws ——, No. 41, and has not yet been replaced with a substantive counterpart, *see* 42 Pa.Cons.Stat.Ann. table 1 (Purdon 1981) *and* 42 Pa.Cons.Stat.Ann. § 1722 (Purdon 1981), we hesitate to affirm the district court's action on exhaustion grounds. We therefore discuss these arguments and, finding no merit in them, do not reach the question whether the legislative changes preclude a negative finding on the exhaustion question.

tial. In reversing the conviction, the Court did so in the exercise of its supervisory power to formulate standards for enforcement of the criminal law in federal court, 360 U.S. at 313, 79 S.Ct. at 1173, and not because the constitution compelled it. True, this court applied the *Marshall* standard to a state case in *United States ex rel. Doggett v. Yeager,* 472 F.2d 229 (3d Cir. 1973), a case on which Martin heavily relies. This reliance, however, is misplaced because the Supreme Court in *Murphy v. Florida,* 421 U.S. 794, 797, 95 S.Ct. 2031, 2034, 44 L.Ed.2d 589 (1974), expressly rejected the extension of the *Marshall* standard to a state case, holding that it had no application beyond the federal courts.

■ A state court conviction may be overturned in a habeas proceeding only where the defendant shows that the publicity had been so extreme as to cause actual prejudice to a degree rendering a fair trial impossible or that the press coverage has "utterly corrupted" the trial. *Murphy v. Florida,* 421 U.S. at 798, 95 S.Ct. at 2035. *See also Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). For example, in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), a small community was barraged for a six month period immediately prior to trial with such inflammatory publicity as the defendant's confession to twenty-four bur-

glaries and six murders (made public by an official press release), his prior convictions, and his unaccepted offer to plead guilty to avoid the death penalty. A pattern of deep and bitter community prejudice shown to be present was reflected in the voir dire examination of the jurors. Eight of the twelve jurors selected had admitted during voir dire that they "thought [the defendant] was guilty." Martin has not shown that any of the impaneled jurors had decided his guilt before trial; he asserts, rather, that most jurors had admitted exposure to pretrial publicity. Publicity standing alone, however, has only rarely been held to demand a change of venue and, when it has, there usually has been evidence of insensitive and active official involvement in its promotion and propagation. *See, e. g., id.* at 719, 81 S.Ct. at 1640, *Rideau v. Louisiana,* 373 U.S. 723, 725, 83 S.Ct. 1417, 1418, 10 L.Ed.2d 663 (1963); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).[5]

Martin has not directed us to any pretrial publicity approaching either the viciousness or magnitude found in *Irvin, Rideau,* and *Sheppard.* Nor has our independent review of the record disclosed any. Further, there are no allegations of official misconduct contaminating the publicity given the case; no claim has been made that the trial itself was "utterly corrupted by press coverage." *Murphy v. Florida,* 421 U.S. at 798, 95 S.Ct. at 2035. There is simply no basis upon

5. In *Rideau,* the Supreme Court reversed the conviction and death sentence of a confessed bank robber who had killed a bank employee in the course of a robbery. The confession had been obtained the morning following the robbery and murder in the Louisiana parish jail where the suspect was being held. A local television station had been allowed, perhaps invited, to videotape the confession and the station then broadcast it to tens of thousands of members of the community from which the jury was drawn. The Court described the film as showing "Rideau [the suspect], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder in response to leading questions by the sheriff." 373 U.S. at 725, 83 S.Ct. at 1418.

*Sheppard v. Maxwell* more closely approaches Martin's theory that the quantity of pretrial publicity may itself require a change of venue. In *Sheppard,* the pretrial period was

characterized by daily headlines and editorials proclaiming the defendant's guilt and revealing tantalizing bits of "State's evidence" that never materialized, including allegations of numerous extramarital affairs of the defendant. The editorials frequently chided public officials for "mollycoddling" the defendant, a local prominent physician. Yet, even with all the inaccurate and inflammatory pretrial publicity and the irresponsibility of a significant portion of the media, the Supreme Court "[could not] say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone." 384 U.S. at 354, 86 S.Ct. at 1518. Rather, the Court ordered that a writ of habeas corpus issue because the trial judge permitted bedlam to reign at the trial, failed to prevent serious disruptive influences in the court, and allowed the intrusion of the media on the deliberative processes occurring in the courtroom. *Id.* at 355, 86 S.Ct. at 1518.

which reasonably to ground a presumption of prejudice stemming from the pretrial publicity generated by the Yablonski murders.

■ Martin next contends that even without a presumption of prejudice, the voir dire of the potential jurors showed widespread actual prejudice among the venire mandating a change of venue. *See* note 4 *supra.* Of the 221 veniremen, 81 were asked whether they had been exposed to pretrial publicity; 71 replied affirmatively. Of these, 23 stated that they had formed fixed opinions of Martin's guilt. None of these, however, served on Martin's jury. Thus, the essence of the pretrial publicity more strongly resembles the publicity in *Murphy* and is far removed from the turmoil, disruption, and inherently prejudicial reporting patently visible in *Irvin.*[6]

In *Murphy*, the defendant also claimed that admissions of prejudice during voir dire by some of the venire required a change of venue, although others on the venire, and the jurors ultimately chosen, claimed impartiality. The Court recognized that "[a] juror's assurances that he is equal to this task cannot be dispositive of the accused's rights," *Murphy v. Florida,* 421 U.S. at 800, 95 S.Ct. at 2036, for in a community where most veniremen will admit to a *disqualifying* prejudice "the reliability of the others' protestations may be drawn into question." *Id.* The Court nevertheless upheld Murphy's conviction. Excusing only 20 of the 78 veniremen questioned because they expressed a disqualifying prejudice "by no means suggest[ed] a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* Similarly, in the present case, excusing 23 of the 71 jurors who admitted fixed opin-

ions of Martin's guilt because of pretrial publicity is insufficient to impute prejudice to those jurors who denied having a fixed opinion. After carefully reviewing the applicable case law and the record before us, we reject Martin's first claim.[7]

### III. Scope of the Voir Dire

Martin argues that his due process rights were violated because the trial court did not permit inquiry into opinions held by the veniremen other than those that were "fixed". He also complains that the court did not permit probing into the facts known and attitudes held by the venire in order to show bias or prejudice of a lesser degree, thus hampering Martin's right to impanel a fair and impartial jury.

■ The Constitution does not guarantee trial by jurors totally oblivious to events unfolding from day to day in the community in which they live. In a society of widespread and almost instant communication, "an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd,* 366 U.S. at 722, 81 S.Ct. at 1642. A juror's ignorance may not be expected; only a juror's impartiality can be assured. Even if a prospective juror has formed some impression or opinion of the merits of the case based upon what the juror has read or heard, that juror may still sit if able to set aside any preconceived notion and render a verdict based on the evidence presented in court. *Id.; United States v. Provenzano,* 620 F.2d at 995. The existence of something less than a fixed opinion is immaterial in the final selection of jurors. Therefore, barring an inquiry into attitudes or opinions less than

---

6. In *Irvin*, 90 percent of the 430-person venire expressed some opinion of guilt. Over 62 percent had formed fixed opinions of guilt. Because many jurors had at many times admitted prejudice, the Court realistically rejected the protestations of the remainder that they could return an impartial verdict. *Irvin v. Dowd,* 366 U.S. at 728, 81 S.Ct. at 1645. Additionally, 8 of the 12 jurors ultimately seated in *Irvin* believed the defendant to be guilty.

7. Martin also relies on language from *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), which is not directly on point. *Estes* involved a situation in which, as in *Sheppard,* the press overran the courtroom and televised the trial, exacerbating the already intense public feelings against the accused. No such facts appear in this case.

fixed does not *per se* violate an accused's constitutional right to impanel an impartial jury. " 'Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.'" *Irvin v. Dowd*, 366 U.S. at 724–25, 81 S.Ct. at 1643 (quoting *United States v. Wood*, 299 U.S. 123, 145–46, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936)).

We recognize that voir dire is the appropriate method for inquiry into possible prejudice or bias on the part of potential jurors, and the procedures used must provide a reasonable assurance for the discovery of prejudice. Thus, inquiry into opinions that are less than fixed may be helpful in uncovering bias, assessing the impact of pretrial publicity and ferreting out attitudes for the purpose of exercising peremptory challenges. However, absent a constitutional infirmity, this court is powerless to require a state court to permit inquiry beyond fixed opinions of guilt or innocence. Limiting the inquiry on voir dire to fixed opinions did not violate a constitutional mandate nor did it contravene state law. *See Commonwealth v. Sparrow*, 471 Pa. 490, 370 A.2d 712 (1977); *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A.2d 552 (1967), *vacated and remanded on other grounds*, 392 U.S. 647, 88 S.Ct. 2277, 20 L.Ed.2d 1344 (1968), *modified*, 449 Pa. 33, 295 A.2d 524 (1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 963 (1973) (only legitimate inquiry is whether juror had fixed opinion of guilt or innocence).

■■ We have independently examined the voir dire proceedings, as we must. *See Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1642. First and most important, we note that Martin does not claim that the voir dire procedures resulted in the selection of a juror holding a fixed opinion of guilt. Second, the scope of the voir dire was broad enough to discover the existence of prejudicial opinions, whether fixed or not. Two hundred twenty-one persons were examined in the six days of jury selection. The voir dire consumed 922 pages of transcript. The trial court struck only fifteen of Martin's ninety proposed questions. The examination was conducted by the judge along with counsel for the defense and prosecution. The veniremen were examined individually and were asked whether they had fixed opinions of Martin's guilt or innocence, whether they had heard or read about Vealey's statement implicating Martin, whether that statement gave rise to a fixed opinion of guilt or innocence, whether anyone attempted to speak with them about the possibility of serving on the jury, whether they heard about the case on radio or television or read of it in newspapers, which broadcasts or articles were particularly remembered, whether such publicity gave rise to an opinion as to the merits of the case, whether they had any connection with the Yablonski family and whether they realized jurors were bound to reach a verdict solely on the evidence introduced during the trial. Follow-up questions were permitted as necessary. Under these circumstances and within the constraints of our scope of review, we conclude that the voir dire was not unconstitutionally restrictive.[8]

8. Martin also mounts a challenge to Washington County's jury pool selection process which operates on a "keyman" system. *See Smith v. Yeager*, 465 F.2d 272 (3d Cir.), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972). *See also Commonwealth v. Martin*, 465 Pa. at 152, 348 A.2d at 400. He does not, however, contend that such a method of selecting prospective jurors *per se* violates a defendant's rights to due process. Indeed, he is foreclosed from such a position. *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). Martin instead argues that the keyman system's inherent potential for abuse, *see id.* at 495 n.14, 97 S.Ct. at 1280 n.14, when combined with the other alleged due process deprivations at his trial, casts significant doubt on the fairness of the proceedings as a whole. However, significant doubts, even if raised, do not constitute a prima facie case of systematic exclusion of an identifiable group within the community, Martin's burden on this claim. *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Once again, Martin attempts to rely on a presumption that is not available to him.

## IV. The Felony-Murder Charge

Martin contends that the trial court's charge to the jury deprived him of his sixth amendment right to a trial by jury because the charge in effect directed a verdict of first degree murder. Martin also claims the charge failed adequately to instruct on two essential elements of the Pennsylvania felony-murder doctrine, a common design by the participants and a homicide in furtherance of that common design. Thus, Martin claims the trial judge thereby reduced the Commonwealth's burden of proving guilt beyond a reasonable doubt.[9]

The Commonwealth's primary theory of the case was that Martin fully and actively participated in planning and carrying out the contract murder of Jock Yablonski. Vealey testified for the Commonwealth that Martin participated in discussions of the murders, in target practice with the weapons to be used, in the forcible entry into the Yablonskis' home, and in shooting the victims. Martin likewise testified that he had engaged in target practice on the morning of the foray to Clarksville. Vealey's testimony was corroborated by Charles Geyer, a subsequent prisonmate of Martin, who testified that Martin claimed to have shot Charlotte Yablonski. The Commonwealth's alternative theory of the case was that if Martin was not the triggerman and indeed acted only as a lookout as he claimed, he could nevertheless be found guilty of first degree murder under Pennsylvania's felony-murder doctrine because of a common design to commit burglary and the killings in furtherance of that common design.[10]

Martin's defense theory of the case was that he knew nothing of Gilly and Vealey's plan to commit murder for hire; he went along with them to Clarksville only to commit a burglary and theft of a valuable coin collection. Martin claims he acted merely as a lookout and remained in the car while Gilly and Vealey broke into the Yablonski home. Martin's testimony was corroborated by evidence that, while three people were involved in this mission, only two weapons were taken to the scene. Martin claims he was needed as a lookout because, as shown by the Commonwealth's evidence, Gilly and Vealey had been spotted in a car in Clarksville trailing Yablonski on previous occasions. Under Martin's defense theory, his intent to commit a burglary differed widely from Gilly and Vealey's intent to commit murder. Therefore, he argues that neither a common design nor a killing in furtherance thereof being present, the felony-murder doctrine does not apply.

As Martin's counsel candidly admitted at oral argument, the state trial "[came] down to a conflict of testimony between Vealey and Martin." Martin claims, however, that under the trial judge's instructions to the jury, the resolution of this conflict was a meaningless gesture. Martin focuses on two sentences from the trial court's seventeen pages of instructions, five and one-half of which dealt with the Commonwealth's contract murder and felony-murder theories:

> If you accept the second theory, the felony murder theory, and *you can do that believing* either the Commonwealth theory or *the defense facts as testified to by Martin*, then you could find Martin guilty of murder in the first degree on the felony murder doctrine. *The defendant's facts* substantially as I explained to you *fit the felony murder doctrine.*

**9.** Martin was charged under the Act of June 24, 1939, 1939 Pa.Laws 872 § 701, which provided:

> All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree.

This statute was subsequently repealed and replaced. *See* 18 Pa.Cons.Stat.Ann. § 2502 (Purdon 1973 & Supp. 1981–82).

**10.** Because murder was not one of the underlying felonies enumerated in the statute, the felony-murder doctrine would be unavailable under a statement of facts which had Martin agreeing to the contract murders but remaining in the car as a lookout. Traditional accomplice liability would apply.

Tr. at 507 (emphasis supplied). Martin claims that the effect of this instruction was to direct the jury to return a verdict of guilt, whether they believed the State's version of the facts or the defendant's.

■ The burden of demonstrating that an erroneous instruction was so prejudicial as to support a federal collateral attack on a state court judgment is greater than that required to establish plain error on direct appeal. In habeas proceedings the question is " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process' . . ., not merely whether 'the instruction is undesirable, erroneous, or even "universally condemned." ' " *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (quoting *Cupp v. Naughton*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). Whether an accused has been denied his constitutional rights depends upon the way in which a juror could have reasonably interpreted the instruction. *Sandstrom v. Montana*, 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979).

■ Initially, it should be noted that the state judge charged in the alternative; the jury could have found Martin guilty of first degree murder under either the contract murder theory or the felony-murder theory.[11] But to sustain the conviction, it is not enough to say that the jury *could have relied* on the contract murder charge, which Martin does not challenge. A conviction cannot stand unless it can be said with some degree of certainty that the jury did not rely on an erroneous charge. *See Sandstrom v. Montana*, 442 U.S. at 526, 99 S.Ct. at 2460; *United States v. Benedetto*, 558 F.2d 171, 176 (3d Cir. 1977).

■ Martin claims the charge had the effect of telling the jury that even if they believed his version, they were still *required* to find Martin guilty of first degree murder. We believe that such an interpretation of the language of the charge is overly strained and it could not be so understood.

The court phrased the first challenged sentence in terms of permission: "if you [the jury] accept the second theory, the felony murder theory, and you *can* do that believing either the Commonwealth theory or the defense facts as testified to by Martin, then you *could* find Martin guilty of murder [under the felony murder doctrine]." (Emphasis supplied.) At this point in his charge, the judge was merely instructing the jury on how the law might be applied to the facts as found by them. At no time did the trial judge invade the factfinding province of the jury. *Cf. United States v. Benedetto*, 558 F.2d at 177–78. The charge at no point gives the State the benefit of a presumption; at no time does it reduce the burden of proving every element of the crime charged beyond a reasonable doubt. *See Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *cf. Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The judge was not even "commenting on the evidence" as Martin contends. The judge was carrying out his duty to instruct 12 laypersons on the law to be applied to the facts found by them.

What was perhaps unusual about this case was that under the applicable law Martin had pursued a defense theory that was legally immaterial to a finding of guilt. *See infra* at 810. The judge so informed the jury when he spoke the second challenged sentence of his charge. "The defendant's facts substantially as I explained to you fit the felony murder doctrine." Yet, despite the shortcomings in Martin's defense theory, the charge nonetheless left the determination of guilt explicitly to the jury. Thus, in the final analysis, the judge properly performed his function in instructing the jury on the law and completely left the ultimate factfinding responsibility of Martin's guilt or innocence to the jury.

In connection with Martin's challenge to the charge, "a single instruction to the jury

---

11. Both contract murder and felony-murder constituted first degree murder at the time. Thus, the jury's general verdict of first degree murder sheds no light on which theory they accepted.

may not be judged in artificial isolation but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. at 146–47, 94 S.Ct. at 400. The two sentences objected to by Martin are found in the midst of nineteen pages of instructions, throughout which the jury was reminded of its responsibility and of the prosecution's burden. The judge explicitly stated that conflicts in testimony were to be resolved by the jury. He instructed them on the credibility of witnesses, and he told the jury to give close and careful scrutiny to testimony against Martin by accomplices. At two separate points, the judge admonished the jury not to attempt to discern his opinion of guilt and then render a conforming verdict.

■ Finally, we discuss briefly Martin's claim that the charge was defective because it did not conform to the law of Pennsylvania at the time. Initially, we point out that this is a state law claim and even if the state had incorrectly applied its own law it would not ordinarily warrant federal habeas relief. *See United States ex rel. Rock v. Pinkey*, 430 F.Supp. 176, 179 (N.D.Ill.1977), *aff'd mem.*, 582 F.2d 1282 (7th Cir. 1978). *See also McMichaels v. Hancock*, 428 F.2d 1222 (1st Cir. 1970). However, because Martin claims that the Pennsylvania Supreme Court, in approving the challenged instruction, *Commonwealth v. Martin*, 465 Pa. at 173–78, 348 A.2d at 411–14, did not fully understand the objection, we will in the interest of judicial economy discuss the issue.

■ Martin argues that at the time of his trial Pennsylvania required a "common design" and a killing "in furtherance of" that common design before accomplice liability for felony murder attached. He claims that under his version of the events, Gilly and Vealey did not join with him in a common design to commit a burglary.[12] Therefore, he claims, any homicide that

they committed could not have been in furtherance of a common design to which Martin was a party. Therefore, Martin contends the charge did not adequately instruct the jury on the requirements for a common design and that the killing occurred in furtherance of it.

We begin by examining Martin's major premise that under his version of the facts, Pennsylvania's felony-murder doctrine was entirely inapplicable. Martin's argument rests on his contention that in 1971 Pennsylvania imposed felony-murder liability only if the common design had been formed prior to the occurrence of the acts leading to death. This argument is crucial to Martin's theory because it is clear that, under both the State and defense evidence, a money clip containing over $200 was stolen from the Yablonski home and that the three shared it. It is also obvious that the killing of the Yablonskis "furthered," in the sense of facilitated, the larceny. As we read the Pennsylvania Supreme Court decision in this case, however, Martin is taking a position that was explicitly rejected during the appellate proceedings in his own case. We cannot say whether the arguments presented on Martin's behalf to the Pennsylvania Supreme Court were precisely the same as those urged here, but the opinion of the state court leaves us convinced that Martin's claims now are foreclosed as a matter of state law. The court stated:

> The proposition that the felony-murder rule is not applicable where the accompanying felony is after the fact of murder and but incidental to it, is quickly answered....

*Commonwealth v. Martin*, 465 Pa. at 134, 348 A.2d at 412 (citing *Commonwealth v. (Warren) Waters*, 445 Pa. 534, 285 A.2d 192 (1972); *Commonwealth v. Slavik*, 437 Pa. 354, 261 A.2d 583 (1970); *Commonwealth v. Hart*, 403 Pa. 652, 170 A.2d 850 (1961)).

---

12. Pennsylvania defines "burglary" as unlawfully entering a building or occupied structure with the intent to commit a crime therein. 18 Pa.Cons.Stat.Ann. § 3502 (Purdon 1973). Martin confines the underlying crime to theft, although it appears that entering with intent to

commit murder could be a burglary as well. However, the common design requirement does not extend only to legal classifications, but rather requires a confluence of intent to commit particular acts.

Martin, however, directs this court to the Pennsylvania Supreme Court's decision in *Commonwealth v. (Gary) Waters*, 491 Pa. 85, 418 A.2d 312 (1980). *Waters*, Martin claims,

is new law explicating the scope of the felony murder in which the Pennsylvania Court (despite rejecting Appellant's argument upon direct appeal asserting a similar interpretation) laid down new law which supports Appellant's interpretation and would mandate reversal of his conviction if applied to his case. . . .

We do not disagree with Martin that *Waters* is new law and we are also unable to say firmly that the law announced in that case is consistent with the charge given in Martin's case. The court in *Waters* dismissed the Commonwealth's argument that a common design need not have existed prior to the killing for an accomplice to be convicted under the felony-murder doctrine. The court found that such cases as *Commonwealth v. Yuknavich*, 448 Pa. 502, 295 A.2d 290 (1972), *Commonwealth v. Slavik*, 437 Pa. 354, 261 A.2d 583 (1970), and *Commonwealth v. Hart*, 403 Pa. 652, 170 A.2d 850 (1961), all heavily relied on by the earlier *Martin* court, no longer controlled disposition of the issue in light of *Commonwealth v. Legg*, 491 Pa. 78, 417 A.2d 1152 (1980), decided the same day as Waters.

However, *Waters* was decided nine years after Martin's trial and five years after his conviction was affirmed by the Pennsylvania Supreme Court. Even were it to be given retroactive effect, and we believe its language fairly negatives such an intention by the court, it would not be the responsibility of a federal court to apply this newly formed state decisional law to a state conviction obtained almost a decade ago. Martin's remedy on such a claim is not in this court.

Therefore, under the then-existing Pennsylvania law of felony murder, the judge adequately charged the jury on the requirement that the killing occur in furtherance of a common design. Preliminarily, the court specifically charged that if one conspires with others to commit a burglary and in the course of the burglary a killing occurs, all are liable for the killing "provided that the killing was done by one acting in furtherance of the felonious undertaking." The jury was told that the mere coincidence of a homicide and a burglary is not enough to satisfy the requirements of the felony-murder doctrine. The judge instructed that the Commonwealth must show "that the conduct causing the death was carried out in furtherance of the design to commit the robbery or burglary. The death must be the consequence of the robbery or burglary and not merely coincidental with it." Further, he charged that the felony-murder doctrine should impose liability for a homicide "only if it resulted from acts done in furtherance of a felony. A close causal connection is required."

Even if the judge's numerous references to people entering into conspiracies or combining to commit a felony did not sufficiently impress upon the jury that common purpose or common design is required under the felony-murder doctrine, he specifically stated that

if the defendants combined to commit a felony or make an assault, and *in carrying out the common purpose*, another is killed, the one who enters into the combination but does not personally commit the wrongful act is equally responsible for the homicide with the one who directly causes it.

Tr. at 506 (emphasis supplied).

Martin's reliance on *United States v. Heinlein*, 490 F.2d 725 (D.C.Cir.1973), to support his challenge of the "common design" aspect of the charge is misplaced, although *Heinlein* admittedly involved an analogous factual situation. In that case, three men were convicted of felony murder in the course of a rape. The victim slapped one of the assailants who retaliated by producing a knife and stabbing the victim. The court charged that the non-slayer defendant could be found guilty of felony murder if the killing was "within the scope of the rape which one or more of the defendants undertook to commit." The defendant had requested an instruction that the killing

must be "in the course of the felony and in furtherance of the common purpose to commit the felony." Defendant's theory in *Heinlein,* which parallels Martin's theory, was that the sudden retaliatory stabbing was independent of any common purpose and actually frustrated or defeated the common purpose, thereby making the felony-murder doctrine inapplicable. The court of appeals reversed the conviction, but not on the basis of the given instructions. In fact, the court noted the verbal difference between the requested and the given instruction was not great. The difference, however, assumed greater importance because the trial court thought the statutory definition of felony-murder precluded the defendant's theory of an intervening independent purpose and consequently did not allow counsel to argue this defense to the jury.

In the instant case, the judge's charge as a whole, on both the "common design" and the "in furtherance" aspects of the felony murder doctrine, adequately stated Pennsylvania law. It did not reduce the Commonwealth's burden of proving beyond a reasonable doubt these two essential elements of the offense, and the charge left to the jury the factual question whether Martin had the same design and intent as did Gilly and Vealey.

### V. Conclusion

We hold that a state trial judge does not commit constitutional error in denying a change of venue when pretrial publicity is basically factual and not inflammatory, when officials close to the investigation and prosecution of the case have not instigated or encouraged large scale or prejudicial exposure, and when the media at all pertinent times exercises its function with restraint and responsibility. We also hold that no constitutional rights are denied when a change of venue is denied although voir dire of prospective jurors indicates significant exposure to publicity and approximately a 25 percent incidence of fixed opinions of guilt, if the trial judge is nonetheless

reasonably satisfied that a fair and impartial jury can be impanelled.[13] We also conclude that no constitutional rights are denied by a trial judge's limiting voir dire inquiries to fixed opinions held by prospective jurors. Furthermore, we conclude that the trial judge's suggestion to the jury that they *could* find the defendant guilty even under his version of the facts does not amount to a directed verdict. Finally, the judge's explanation of the felony-murder doctrine was in accord with the applicable Pennsylvania law.

The judgment of the district court will be affirmed.

---

**13.** Therefore, Martin suffered no prejudice redressable in this court because of ineffective assistance of counsel resulting from the failure

to move for a change of venue after the completion of voir dire.